242 F.3d 198 (4th Cir. 2001)
 TFWS, INCORPORATED, t/a Beltway Fine Wine and Spirits, Plaintiff-Appellant,
v.
WILLIAM DONALD SCHAEFER, in his official capacity as Comptroller of the Treasury of the State of Maryland; CHARLES W. EHART, in his official capacity as Administrator of the Alcohol and Tobacco Tax Unit of the Comptroller of the State of Maryland, Defendants-Appellees.
MARYLAND LIQUOR STORES ASSOCIATION, INCORPORATED; MARYLAND STATE LICENSED BEVERAGE ASSOCIATION; MARYLAND UNITED LICENSEES BEVERAGE ASSOCIATION, Amici Curiae.
TFWS, INCORPORATED, t/a Beltway Fine Wine and Spirits, Plaintiff-Appellee,
v.
WILLIAM DONALD SCHAEFER, in his official capacity as Comptroller of the Treasury of the State of Maryland; CHARLES W. EHART, in his official capacity as Administrator of the Alcohol and Tobacco Tax Unit of the Comptroller of the State of Maryland, Defendants-Appellants.
MARYLAND LIQUOR STORES ASSOCIATION, INCORPORATED; MARYLAND STATE LICENSED BEVERAGE ASSOCIATION; MARYLAND UNITED LICENSEES BEVERAGE ASSOCIATION, Amici Curiae.
 No. 99-2279 No. 99-2342.
 UNITED STATES COURT OF APPEALS, FOR THE FOURTH CIRCUIT.
 Argued: April 5, 2000.
Decided: March 1, 2001.
 
 Appeals from the United States District Court for the District of Maryland, at Baltimore.
 Frederic N. Smalkin, District Judge. (CA-99-2008-S)[Copyrighted Material Omitted][Copyrighted Material Omitted]
 COUNSEL: ARGUED: William James Murphy, MURPHY & SHAFFER, Baltimore, Maryland, for Appellant. Steven Marshall Sullivan, Assistant Attorney General, Baltimore, Maryland, for Appellees. ON BRIEF: Robert T. Shaffer, III, John J. Connolly, MURPHY & SHAFFER, Baltimore, Maryland, for Appellant. J. Joseph Curran, Jr., Attorney General of Maryland, Meredyth Smith Andrus, Assistant Attorney General, Baltimore, Maryland, for Appellees. William B. Schreiber, Alan Warshauer, WORMSER, KIELY, GALEF & JACOBS, L.L.P., New York, New York, for Amici Curiae.
 Before LUTTIG and MICHAEL, Circuit Judges, and Claude M. HILTON, Chief United States District Judge for the Eastern District of Virginia, sitting by designation.
 Affirmed in part, vacated in part, and remanded by published opinion. Judge Michael wrote the opinion, in which Chief Judge Hilton joined. Judge Luttig wrote a concurring opinion.
 OPINION
 MICHAEL, Circuit Judge:
 
 
 1
 This case involves an antitrust challenge to certain Maryland statutes and regulations that control the wholesale prices of liquor and wine (together, "liquor") in that state. Plaintiff TFWS, Inc. owns and operates a large retail liquor store in Towson, Maryland, known as Beltway Fine Wine & Spirits. TFWS sued Maryland's State Comptroller and the Administrator of the Alcohol and Tobacco Tax Unit of the Comptroller's office (together, the "Comptroller"), seeking a declaration that Maryland's regulatory scheme, which (1) requires liquor wholesalers to post prices and adhere to them and (2) prohibits volume discounts, is a violation of S 1 of the Sherman Act. Acting on the Comptroller's motion to dismiss, the district court held that TFWS's suit could be maintained under the Ex parte Young doctrine, that Maryland's liquor regulatory scheme is a "hybrid restraint" constituting a per se violation of S 1 of the Sherman Act, and that Maryland's scheme is not shielded by "state action" immunity from the antitrust laws. Acting on its own motion, the district court went on to hold that the regulatory scheme, notwithstanding its anticompetitive effect, should be upheld because Maryland's interest under the Twenty-first Amendment trumps the federal interest under the Sherman Act. The district court therefore dismissed the complaint. We affirm in part and vacate in part. We vacate the district court's Twenty-first Amendment ruling, which was made without a record. Both sides should have the chance to offer evidence on Maryland's Twenty-first Amendment defense before the district court balances Maryland's interest under the Amendment against the federal interest in promoting competition. Accordingly, the case will be remanded for further proceedings on the Twenty-first Amendment question.
 
 I.
 
 2
 The Twenty-first Amendment repealed Prohibition in 1933 and gave the states wide latitude to regulate liquor distribution and sales within their borders. See U.S. Const. amend. XXI; North Dakota v. United States, 495 U.S. 430, 431 (1990). Two methods of regulation have emerged. The first is the operation of a state monopoly on liquor sales with state-run stores. The second is a licensing system that grants licenses to those in the liquor distribution chain, namely, manufacturers, wholesalers, and retailers, who must operate under detailed regulations. In Maryland the licensing system is the prevailing method of regulating liquor sales, and it is the system in force in Baltimore County, where TFWS operates.
 
 
 3
 Maryland's liquor licensing system imposes stiff restrictions on how manufacturers and wholesalers (together, "wholesalers") price their products to retailers. (Retailers, such as TFWS, must buy all of the liquor they resell to consumers from licensed wholesalers. See Md. Ann. Code art. 2B, S 12-107.) In this case TFWS challenges two of the price restrictions Maryland imposes on the wholesale market: the post-and-hold pricing system and the prohibition of volume discounts.
 
 
 4
 The post-and-hold system, which is mandated by Maryland's Alcoholic Beverages Code and implemented by the Comptroller through regulation, promotes stable and uniform prices in the wholesale liquor market. The statute directs the Comptroller to establish a price posting system that requires wholesalers to file price schedules and proposed price changes that are made available to their competitors. See Md. Ann. Code art. 2B, S 12-103(c). By the fifth of each month wholesalers must post with the Comptroller a schedule of any price changes they intend to make for the following month. See Md. Regs. Code tit. 03, S 02.01.05B(2). The Comptroller then makes these postings available to other wholesalers, see id. S .05D(2), who are given until the thirteenth of the month to file amended price schedules for new brands or new sizes of existing brands, see id. S .05C(2). Of course, when one wholesaler posts a price change for an existing product, a competitor may match that price in a regular filing the following month. Under the post-and-hold system wholesalers must sell to retailers at the prices established in the posted schedule for at least the month following the posting. See id. S .05B(2)(c).
 
 
 5
 The volume discount ban is also based on provisions in the statute and the Comptroller's regulations. The statute prohibits wholesalers from discriminating in price "between one retailer and another retailer." Md. Ann. Code art. 2B, S 12-102(a). The Comptroller by regulation prohibits wholesalers from offering discounts "of any nature" to liquor retailers. Md. Regs. Code tit. 03, S 02.01.05B(3)(c).
 
 
 6
 The post-and-hold system and the volume discount ban have one overriding purpose: fostering and promoting temperance. See Md. Ann. Code art. 2B, SS 12-102, -103(a). The regulatory scheme allegedly promotes temperance by eliminating price wars among liquor wholesalers and by maintaining wholesale prices at stable (and higher) levels. See id. S 12-103(a). The "Declaration of policy" for Maryland's Alcoholic Beverages Code acknowledges the anticompetitive intent of the state's liquor control laws and regulations. Specifically, regulators are given broad power (1) to "displace or limit economic competition by regulating . . . the sale or distribution of alcoholic beverages" and (2) to "adopt and enforce [authorized] regulations . . . notwithstanding any anticompetitive effect." Id. S 1101(b)(2).
 
 
 7
 The Comptroller has broad authority to enforce the post-and-hold system and the volume discount ban. See id. SS 10-401, 12-103(d). According to TFWS, the Comptroller routinely enforces and threatens to enforce both of these restrictions against wholesalers. The Comptroller has the authority to revoke or suspend a wholesaler's license for a violation of the liquor control statutes and regulations. See id. S 10-401. The Comptroller may also accept"an offer of compromise" (a fine, in effect) instead of revoking or suspending a license. Id. S 10402. Also, the Comptroller regularly publishes notices of violations of the pricing provisions, including the sanctions imposed, and distributes those notices to all liquor wholesalers.
 
 
 8
 TFWS asserts that Maryland's controls on wholesale liquor pricing are anticompetitive and cause the company to lose sales volume and profits in its retail business. According to TFWS, the State's pricing scheme restrains competition by allowing wholesalers to do two things: (1) match each other's prices at artificially high levels and (2) maintain those high prices. TFWS therefore filed this action in district court against the Comptroller, seeking a declaration that the Comptroller's continuing enforcement of Maryland law and regulations imposing the post-and-hold pricing system and banning volume discounts violates S 1 of the Sherman Act. The Comptroller promptly moved to dismiss under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction on the following two grounds: (1) that the Eleventh Amendment bars the action against the Comptroller, who was sued in his official capacity and (2) that S 1 of the Sherman Act "does not apply to the defendant State official['s] enforcement of State law" (in other words, the suit is barred by the "state action" doctrine).
 
 
 9
 The district court summarily rejected the Comptroller's Eleventh Amendment defense, holding that TFWS's action could proceed under the Ex parte Young exception because it simply seeks to enjoin the Comptroller from committing violations of the Sherman Act by his "enforcement of state law allegedly inconsistent therewith." As a preliminary to considering the state action question, the district court measured Maryland's liquor pricing scheme against the strictures of S 1 of the Sherman Act. The district court held that Maryland's regulatory scheme constitutes a per se violation of the antitrust law. According to the district court, the scheme is an illegal "hybrid restraint," that is, a scheme in which Maryland"authorize[s] price setting and enforce[s] the prices established by private entities." Because Maryland neither establishes the posted prices nor reviews them for reasonableness, the court held that the Comptroller was not immunized by the state action doctrine. Next, the district court on its own motion reached the ultimate issue: whether "the Twenty-first Amendment trumps the Sherman Act in this case." The court proceeded to balance the federal and state interests without any input from the parties. Relying mainly on its own instincts and perceptions, the district court concluded that "despite the anticompetitive effect of the scheme challenged in this case, it should be upheld under the powers reserved to the states under the Twenty-first Amendment." The court then dismissed the complaint for failure to state a claim. TFWS appeals on the Twenty-first Amendment issue, and the Comptroller cross appeals on the issues relating to Eleventh Amendment immunity, the Sherman Act, and state action immunity. We review all of these issues de novo. See Lynn v. West, 134 F.3d 582, 585 (4th Cir. 1998).
 
 II.
 
 10
 The district court held that the Eleventh Amendment does not bar TFWS's suit, and we agree. The suit, brought against a state official (the Comptroller) to end alleged violations of the Sherman Act that are said to be continuing, is authorized under Ex parte Young, 209 U.S. 123 (1908).
 
 
 11
 The Eleventh Amendment grants "an unconsenting State [immunity] from suits brought in federal court by her own citizens as well as by citizens of another State." Edelman v. Jordan, 415 U.S. 651, 662-63 (1974). See also Seminole Tribe of Fla. v. Florida, 517 U.S. 44, 72-73 (1996) ("The Eleventh Amendment restricts the judicial power under Article III . . . ."). However, the Ex parte Young exception to Eleventh Amendment immunity remains generally available to a plaintiff who seeks prospective declaratory and injunctive relief against a state official for an ongoing violation of federal law. See Idaho v. Coeur d'Alene Tribe, 521 U.S. 261, 294, 296 (1997) (O'Connor, J., concurring); id. at 297-98 (Souter, J., dissenting); Green v. Mansour, 474 U.S. 64, 68 (1985); Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 106 (1984); Booth v. Maryland, 112 F.3d 139, 141-42 (4th Cir. 1997). The Young exception is an "essential . . . part of our sovereign immunity doctrine," Alden v. Maine, 527 U.S. 706, 748 (1999), that is necessary "to promote the vindication of federal rights," Pennhurst, 465 U.S. at 105. See also Green, 474 U.S. at 68 (affirming that "the availability of prospective relief of the sort awarded in Ex parte Young, gives life to the Supremacy Clause"). Although recent Supreme Court cases have added muscle to the constitutional principle of state immunity from litigation, the Court has not questioned the continuing validity of the Young exception. See Alden, 527 U.S. at 747 ("[C]ertain suits for declaratory and injunctive relief against state officers must . . . be permitted if the Constitution is to remain the supreme law of the land."); Seminole Tribe, 517 U.S. at 72 n.16 ("[A]n individual may obtain injunctive relief under Ex parte Young in order to remedy a state officer's ongoing violation of state law.").
 
 
 12
 According to TFWS's complaint, the Comptroller's continued enforcement of the post-and-hold scheme and the volume discount ban violates S 1 of the Sherman Act. The company seeks declaratory and injunctive relief: it asks that these pricing restrictions be declared unlawful and that the Comptroller be enjoined from enforcing them. TFWS does not request money damages or other retrospective relief for past violations. Because TFWS alleges an ongoing violation of federal law and seeks only prospective relief, it appears that the company's suit against Maryland's Comptroller fits neatly within the Young exception to Eleventh Amendment immunity. See Coeur d'Alene, 521 U.S. at 281 ("An allegation of an ongoing violation of federal law where the requested relief is prospective is ordinarily sufficient to invoke the Young fiction.").
 
 
 13
 Relying on the Supreme Court's recent decision in Idaho v. Coeur d'Alene Tribe, Maryland argues that it has a"special sovereignty interest" in liquor regulation that removes this case from the Young exception. Before considering the specifics of Maryland's argument, we look briefly at Coeur d'Alene. The Coeur d'Alene Tribe claimed that federal law gave it beneficial ownership of the submerged lands and banks of Lake Coeur d'Alene in Idaho. The Tribe sued Idaho state officials seeking a declaration of its ownership and an injunction barring state officers from exercising regulatory authority over the submerged lands. See id. at 264-65. The Supreme Court held that the Tribe's suit was barred by the Eleventh Amendment; specifically, the Young exception did not apply because of the"particular and special circumstances" that made the Tribe's suit "unusual." Id. at 287, 281. The suit was unusual, the Court said, because it was the "functional equivalent of a quiet title action which implicate[d] special sovereignty interests." Id. at 281.
 
 
 14
 The Supreme Court's conclusion that Young did not apply was based on its examination of the "effect of the Tribe's suit and its impact on [Idaho's] special sovereignty interests." Id. This examination raised two concerns. First, the Court was concerned that the Tribe was asking a federal court to declare that the submerged lands were for the Tribe's exclusive use and occupancy. See id. at 282. It was, in essence, attempting to divest the State of Idaho of a substantial property interest. Second, the Court was concerned that the Tribe was seeking (1) a declaration "that the lands in question [were] not even within the regulatory jurisdiction of the State" and (2) an injunction that would "bar the State's principal officers from exercising their governmental powers and authority over the disputed lands." Id. The Court relied on history to explain the importance of submerged lands to state sovereignty. The Court emphasized that"lands underlying navigable waters have historically been considered`sovereign lands.'" Id. at 283. Indeed, state ownership and control of submerged lands is "`considered an essential attribute of[state] sovereignty.'" Id. (quoting Martin v. Lessee of Waddell, 16 Pet. 367, 410 (1842)). The Court concluded "that if the Tribe were to prevail, Idaho's sovereign interest in its lands and waters would be affected in a degree fully as intrusive as almost any conceivable retroactive levy upon funds in its Treasury." Id. at 287. In sum, the Court decided that the Young rule did not apply because the Tribe's suit was not really a suit to enjoin state officials from an ongoing violation of federal law. Rather, it was the "functional equivalent" of a suit against the State of Idaho itself because it sought to dispossess the State from land within its borders and to remove that land from the State's regulatory authority.
 
 
 15
 Maryland asserts that its authority as a state to regulate liquor under the Twenty-first Amendment qualifies as a"special sovereignty interest" under Coeur d'Alene. According to Maryland, because TFWS's suit in essence seeks to enjoin the State from exercising this regulatory authority, the suit (like the Tribe's suit in Coeur d'Alene) is barred by the Eleventh Amendment. We disagree. Both Coeur d'Alene and TFWS's complaint are sufficiently narrow that they do not conflict. As a result, TFWS's suit is allowed under the Young exception.
 
 
 16
 First, we do not believe that the Twenty-first Amendment creates state authority that qualifies as a "special sovereignty interest" under Coeur d'Alene. In Coeur d'Alene Idaho's ownership over the submerged lands was considered an "essential attribute" of the state's "sovereign authority and its standing in the Union." Coeur d'Alene, 521 U.S. at 282, 283. These lands, the Supreme Court said, are "tied in a unique way to [state] sovereignty" by reason of ancient doctrines and the development of English and early American law. Id. at 282-86. Indeed, a state's right to submerged lands is said to be absolute, "`subject only to the rights . . . surrendered by the Constitution to the general government.'" Id. at 283 (quoting Martin, 16 Pet. at 410). Maryland's power under the Twenty-first Amendment is not as basic or exclusive as a state's territorial right to its submerged lands. As the Supreme Court has said, "important federal interests in liquor matters survived the ratification of the Twenty-first Amendment." Ca. Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc., 445 U.S. 97, 108 (1980). For example, a state's power to regulate liquor, although substantial, "may be subject to the federal commerce power in appropriate situations." Id. at 110. When federal and state interests over liquor regulation come into conflict, those interests "can be reconciled only after careful scrutiny . . . in a `concrete case.'" Id. (quoting Hostetter v. Idlewild Bon Voyage Liquor Corp., 377 U.S. 324, 332 (1964)). Because there is "no bright line between federal and state powers over liquor," id., we do not believe that Maryland's Twenty-first Amendment power qualifies as a "special" state sovereignty interest under Coeur d'Alene.
 
 
 17
 Even if the Twenty-first Amendment did create a special sovereignty interest, Coeur d'Alene presents one more hurdle for Maryland. We must examine "the effect of [TFWS's] suit and its impact on" any special sovereignty interest "in order to decide whether the Ex parte Young fiction is applicable." Coeur d'Alene, 521 U.S. at 281. To guide our examination, we look at what the Tribe sought in Coeur d'Alene: a declaration that the submerged lands were not within the sovereign jurisdiction of Idaho and an injunction that would have altogether eliminated Idaho's regulatory authority over these lands. The prospects of such a judgment created "particular and special circumstances" that rendered "the Young exception inapplicable." Id. at 287. What TFWS seeks in this case is quite different from what the Tribe wanted in Coeur d'Alene. TFWS is not seeking to strip Maryland of its authority to regulate liquor under the Twenty-first Amendment; it simply seeks to require the Comptroller to regulate in a way that is consistent with the Sherman Act. TFWS's claim is not out of the ordinary, and it is in line with the Young exception.
 
 III.
 
 18
 The framework for considering whether a state's liquor pricing regulations can be successfully challenged under the Sherman Act was established by the Supreme Court in California Retail Liquor Dealers Association v. Midcal Aluminum, Inc., 445 U.S. 97 (1980). The threshold question is whether the state's pricing regulations violate the Sherman Act. See id. at 102. The next question is whether the regulations are shielded from the Sherman Act under the"state action" doctrine. See id. at 103. The final question is whether the Twenty-first Amendment overrides a Sherman Act challenge to the regulations. See id. at 106.
 
 A.
 
 19
 Section 1 of the Sherman Act says, "Every contract, combination . . . or conspiracy, in restraint of trade . . . is hereby declared to be illegal." 15 U.S.C. S 1. We agree with the district court that Maryland's liquor regulatory scheme is a hybrid restraint that amounts to a per se violation of S 1.
 
 
 20
 When a state regulatory scheme is challenged for being irreconcilable on its face with S 1 of the Sherman Act, the antitrust violation must be of the per sevariety. See Rice v. Norman Williams Co., 458 U.S. 654, 661 (1982); see also Fisher v. City of Berkley, 475 U.S. 260, 270 n.2 (1986). According to Rice, we approach the issue in the following way: "we apply principles similar to those we employ in considering whether any state statute is pre-empted by a federal statute pursuant to the Supremacy Clause. As in the typical pre-emption case, the inquiry is whether there exists an irreconcilable conflict between the federal and state regulatory schemes." Rice, 458 U.S. at 659. A state regulatory scheme, when challenged on its face, "may be condemned under the antitrust laws only if it mandates or authorizes conduct that necessarily constitutes a violation of the antitrust laws in all cases, or if it places irresistible pressure on a private party to violate the antitrust laws in order to comply with the statute." Id. at 661. See also 324 Liquor Corp. v. Duffy, 479 U.S. 335, 341 (1987) (inquiring whether New York liquor pricing law that allowed wholesalers to control retail prices was a per se violation ofS 1 of the Sherman Act).
 
 
 21
 Our analysis under S 1 has two steps. We first decide whether the regulatory system at issue is a "unilateral restraint" or a "hybrid restraint." See Fisher, 475 U.S. at 267-68. Second, if it is a hybrid restraint, we must decide whether it involves a per se violation of S 1. See Canterbury Liquors & Pantry v. Sullivan, 16 F. Supp. 2d 41, 45 (D. Mass. 1998).
 
 
 22
 A state law that restrains competition may survive a Sherman Act preemption challenge if the state unilaterally imposes the restraint. See Fisher, 475 U.S. at 266-67. In Fisher the City of Berkeley, California, enacted a rent stabilization ordinance that placed strict rent controls on certain classes of real property rented for residential use. See id. at 262. The ordinance required landlords to adhere to the prescribed rent ceilings, and violators were subject to civil and criminal penalties. See id. at 262-63. A group of landlords sued the city, claiming that the rent control ordinance was a traditional per se price fixing violation. The Supreme Court rejected the landlords' challenge. Because S 1 of the Sherman Act is directed only at "unreasonable restraints of trade effected by a `contract, combination . . . or conspiracy' between separate entities," id. at 266 (quoting Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 768 (1984)), the Court concluded that the city's unilateral imposition of rent control did not amount to agreement or "concerted action," id. The Court acknowledged the landlords' argument that if they had banded together to fix rental prices in the absence of an ordinance, their action would have been a per se violation of the Sherman Act. See id. The method prescribed by the ordinance saved it from S 1, according to the Court:
 
 
 23
 A restraint imposed unilaterally by government does not become concerted-action within the meaning of the [Sherman Act] simply because it has a coercive effect upon parties who must obey the law. The ordinary relationship between the government and those who must obey its regulatory commands whether they wish to or not is not enough to establish a conspiracy. Similarly, the mere fact that all competing property owners must comply with the same provisions of the Ordinance is not enough to establish a conspiracy among landlords. Under Berkeley's Ordinance, control over the maximum rent levels of every affected residential unit has been unilaterally removed from the owners of those properties and given to the Rent Stabilization Board.
 
 
 24
 Id. at 267. In sum, the city's rent control scheme did not run afoul of S 1 because "the rent ceilings imposed by the Ordinance and maintained by the Rent Stabilization Board have been unilaterally imposed by government upon landlords to the exclusion of private control." Id. at 266.
 
 
 25
 The Supreme Court in Fisher was careful to recognize, however, that a governmentally imposed trade restraint that enforces private pricing decisions is a "hybrid restraint" that fulfills the Sherman Act's "concerted action" requirement.
 
 As the Court said:
 
 26
 Not all restraints imposed upon private actors by government units necessarily constitute unilateral action outside the purview of S 1. Certain restraints may be characterized as "hybrid," in that nonmarket mechanisms merely enforce private marketing decisions. See Rice v. Norman Williams Co., 458 U.S. at 665 (Stevens, J., concurring in judgment). Where private actors are thus granted "a degree of private regulatory power," id., at 666, n.1, the regulatory scheme may be attacked under S 1.
 
 
 27
 Fisher, 475 U.S. at 267-68.
 
 
 28
 The Supreme Court in Fisher characterized two of its decisions, Schwegmann Bros. v. Calvert Distillers Corp., 341 U.S. 384 (1951), and Ca. Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc., 445 U.S. 97 (1980), as involving hybrid restraints. A later decision, 324 Liquor Corp. v. Duffy, 479 U.S. 335 (1987), also involved a regulatory scheme that was termed a hybrid restraint. All three of these cases, Schwegmann, Midcal, and 324 Liquor, dealt with the liquor or wine industry and some form of state-sanctioned resale price maintenance.
 
 
 29
 In Schwegmann a Louisiana statute authorized a liquor distributor to enforce its resale price maintenance agreement with one retailer against non-signing retailers. See Schwegmann , 341 U.S. at 387. This was a hybrid restraint because the involvement of the distributor in setting retail prices "made it impossible to characterize the regulation as unilateral action by the State of Louisiana." Fisher, 475 U.S. at 268 (discussing Schwegmann). In Midcal a California statute, among other things, required vintners to set the resale prices of their wholesalers, regardless of whether the wholesalers agreed. See Midcal, 445 U.S. at 99. This was also a hybrid restraint of trade. The vintners set the prices, and "the mere existence of legal compulsion [that is, the state statute requiring price setting] did not turn California's scheme into unilateral action by the State." Fisher, 475 U.S. at 268 (discussing Midcal). In the third case, 324 Liquor, New York's liquor pricing statutes and regulations permitted wholesalers to control the minimum resale prices of retailers. See 324 Liquor, 479 U.S. at 340. The Court found the scheme to be a hybrid restraint because the state "granted [private actors] a degree of private regulatory power." Id. at 345 n.8 (quoting Fisher, 475 U.S. at 208) (internal quotation marks omitted). The Court therefore rejected the defendants' "contention that there [was] no `contract, combination . . ., or conspiracy, in restraint of trade.'" 324 Liquor, 479 U.S. at 345 (quoting 15 U.S.C. S 1).
 
 
 30
 Common threads run through Schwegmann, Midcal, and 324 Liquor. Each involved state liquor or wine laws that empowered private parties to set prices, and those prices were enforced by government mechanisms. Each involved a hybrid restraint subject to challenge under S 1 as concerted action. (The Supreme Court found that the hybrid restraint in each case was a per se violation of S 1, but we get a bit ahead of our story in noting this.)
 
 
 31
 We must now say whether Maryland's liquor regulatory scheme requiring post-and-hold pricing and prohibiting volume discounts is a hybrid restraint. The post-and-hold system is a classic hybrid restraint: the State requires wholesalers to set prices and stick to them, but it does not review those privately set prices for reasonableness; the wholesalers are thus granted a significant degree of private regulatory power. The volume discount ban is a part of the hybrid restraint because it reinforces the post-and-hold system by making it even more inflexible. Wholesalers post their prices as required, and discounts of any nature are prohibited by regulation.
 
 
 32
 Our determination that the challenged Maryland liquor pricing scheme is a hybrid restraint does not necessarily mean that it violates S 1 of the Sherman Act. See Canterbury Liquors & Pantry v. Sullivan, 16 F. Supp. 2d 41, 46 (D. Mass. 1998). We turn, then, to the S 1 per se analysis. Per se violations arise from "certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." Continental T.V., Inc. v. GTE Sylvania, Inc., 433 U.S. 36, 50 (1977) (quoting Northern Pac. R. Co. v. United States, 356 U.S. 1, 5 (1958)). Our analysis of Maryland's wholesale liquor pricing scheme leads us to conclude that it constitutes a per se violation ofS 1 of the Sherman Act.
 
 
 33
 Under Maryland's post-and-hold system, liquor wholesalers post prices and adhere to them for thirty days after they are in effect. Moreover, with respect to new brands and sizes, competing wholesalers may match the prices of the posting wholesaler before the posted prices go into effect. If liquor wholesalers entered into private agreements to accomplish what is required (and allowed) under the Maryland scheme, a per se Sherman Act violation would result. There is, we recognize, a "plain distinction between the lawful right to publish prices . . . on the one hand, and an agreement among competitors limiting action with respect to the published prices, on the other." Catalano, Inc. v. Target Sales, Inc., 446 U.S. 643, 649-50 (1980) (per curiam). This distinction makes one thing obvious: agreements to adhere to previously announced prices are unlawful per se. See Sugar Inst. v. United States, 297 U.S. 553, 601 (1936) (noting that "steps taken to secure adherence, without deviation, to prices and terms . . . announced" violate S 1). Again, Maryland's post-and-hold pricing scheme mandates the exchange of price information by wholesalers through public posting and dissemination, and it requires adherence to the publicly announced prices. The Maryland system thus mandates activity that is essentially a form of horizontal price fixing, which has been called "the paradigm of an unreasonable restraint of trade." NCAA v. Bd. of Regents of the Univ. of Okla., 468 U.S. 85, 100 (1984). Maryland's post-and-hold regime is subject to S 1 as a hybrid restraint, and we hold that it is illegal per se.
 
 
 34
 Other lower courts considering state post-and-hold beverage pricing systems have likewise concluded that they constitute per se violations of the Sherman Act. For example, in Miller v. Hedlund, 813 F.2d 1344, 1349 (9th Cir. 1986), the Ninth Circuit struck down Oregon's regulatory scheme, which was nearly identical to Maryland's. The Oregon regulations required wholesalers to post wine and beer prices ten days prior to their effective date and to adhere to the posted prices for specified periods, which were 30 days for wine and 180 days for beer. See id. at 1347. (The state did not review the posted prices for reasonableness.) The court said, "If the wholesale beer and wine distributors had entered into a private agreement to accomplish what is otherwise required by the Oregon regulations, there is no question that a per se violation of Section 1 of the Sherman Act would be found." Id. at 1349. Because the state regulations compelled activity (the public posting of prices and adhering to those prices) that "would otherwise be a per se violation of the Sherman Act," id., the Oregon regime qualified as a hybrid restraint amounting to a per se violation of the Sherman Act.
 
 
 35
 Several district courts have reached the same result. See, e.g., Beer & Pop Warehouse v. Jones, 41 F. Supp. 2d 552, 560-62 (M.D. Pa. 1999) (holding that Pennsylvania post-and-hold pricing statute for beer was a per se violation of the Sherman Act); Canterbury Liquors & Pantry v. Sullivan, 16 F. Supp. 2d 41, 47-48 (D. Mass. 1998) (holding that Massachusetts post-and-hold liquor pricing scheme was a per se violation of S 1). The only notable exception to these circuit and district court decisions is Battipaglia v. New York State Liquor Authority, 745 F.2d 166 (2d Cir. 1984), a case in which a divided panel upheld a post-and-hold system for wholesale liquor prices in New York. Battipaglia has not been followed elsewhere, and a leading commentator on antitrust law has sided with the dissent. See 1 Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law P 217, at 308-09 (2d ed. 2000) ("Given the great danger that agreements to post and adhere will facilitate horizontal collusion, the dissent's position [in Battipaglia] is more consistent with" the Supreme Court's hybrid restraint jurisprudence).
 
 
 36
 Maryland's volume discount ban is also a per se violation of the Sherman Act, according to Catalano. In Catalano the Supreme Court considered a claim by beer retailers that wholesalers, in agreeing to stop providing short-term credit to retailers, had violated the Sherman Act. See Catalano, 446 U.S. at 644-45. The Court held that the agreement was a per se violation of S 1, reasoning that "[a]n agreement to terminate the practice of giving credit is . . . tantamount to an agreement to eliminate discounts, and thus falls squarely within the traditional per se rule against price fixing." Id. at 648. At least one other court has held that the elimination of volume discounts is a per se violation of S 1 under Catalano. See Godix Equip. Exp. Corp. v. Caterpillar, Inc., 948 F. Supp. 1570, 1576 (S.D. Fla. 1996), aff'd, 144 F.3d 55 (11th Cir. 1998).
 
 
 37
 For the foregoing reasons, we hold that the Maryland statutes and regulations that require liquor wholesalers to post and hold their prices and that prohibit them from offering volume discounts constitute a per se violation of S 1 of the Sherman Act.
 
 B.
 
 38
 The district court correctly held that Maryland cannot claim "state action" immunity from the Sherman Act. The state action immunity doctrine, first articulated in Parker v. Brown , 317 U.S. 341, 351 (1943), holds that the Sherman Act was not "intended to restrain state action or official action directed by a state." Id. On the other hand, "a state does not give immunity to those who violate the Sherman Act by authorizing them to violate it, or by declaring that their action is lawful." Id. The Supreme Court has articulated a two-part test for determining whether immunity exists under Parker v. Brown: "First, the challenged restraint must be one `clearly articulated and affirmatively expressed as state policy;' second, the policy must be `actively supervised' by the State itself." Ca. Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc., 445 U.S. 97, 105 (1980) (quoting City of Lafayette v. La. Power & Light Co., 435 U.S. 389, 410 (1978)). The district court held that Maryland's regulatory system satisfied the first part of this test but failed the second part for lack of active supervision.
 
 
 39
 The district court's denial of immunity is validated by 324 Liquor Corp. v. Duffy, 479 U.S. 335, 344-45 (1987), a case in which the Supreme Court held that one aspect of the New York State liquor pricing system was not entitled to antitrust immunity under Parker v. Brown. The scheme challenged in 324 Liquor involved a New York State liquor statute that (1) required liquor wholesalers to post prices to retailers per bottle and per case and (2) required retailers to charge at least 112 percent of the wholesalers' posted bottle price. See id. at 339-40. Because most retailers bought by the case, the wholesalers could effectively manipulate the retail price of liquor. See id. at 340. The Court ruled that New York's program was not entitled to antitrust immunity because the State did not actively supervise the pricing scheme. See id. at 344. The Court, in concluding that the program was not actively supervised, said that it "`simply authorizes price setting and enforces the prices established by private parties. . . . New York neither establishes prices nor reviews the reasonableness of price schedules.'" Id. at 344-45 (quoting Midcal, 445 U.S. at 105) (internal citations omitted). In addition, the Court noted that the State did not monitor the conditions in the liquor market nor did it "engage in any `pointed reexamination' of the program." Id. at 345 (quoting Midcal, 445 U.S. at 105).
 
 
 40
 Maryland's post-and-hold system, like New York's scheme in 324 Liquor, is not actively supervised. Maryland's Comptroller does not set liquor prices; the wholesalers have discretion to determine their posted prices. Although Maryland law requires wholesalers to post prices and adhere to them, the Comptroller, who enforces the prices, has no authority to review them for reasonableness. Moreover, as the district court concluded, the Comptroller does not monitor liquor market conditions or engage in any "pointed reexamination" of Maryland's liquor pricing program. For these reasons, the Comptroller's involvement in the regulatory scheme is insufficient to establish antitrust immunity under Parker v. Brown.
 
 C.
 
 41
 The final question, whether the Twenty-first Amendment bars application of the Sherman Act in this case, is one of considerable importance. Section 2 of the Twenty-first Amendment provides: "The transportation or importation into any State, Territory, or possession of the United States for delivery or use therein of intoxicating liquors in violation of the laws thereof, is hereby prohibited." U.S. Const. amend. XXI.
 
 
 42
 The district court decided the Twenty-first Amendment question even though Maryland had not yet raised the Amendment as a defense. Because Maryland raised other issues in its motion to dismiss, neither side had a chance to make its case on the Twenty-first Amendment issue. The district court nevertheless tackled the matter -with commendable diligence, we might add -holding that "despite the anticompetitive effect of the [liquor regulatory] scheme challenged in this case, it should be upheld under the powers reserved to the States under the Twenty-first Amendment." This conclusion, the court said, was based on its own "rational perception and common sense" and "upon facts extant in the real world." The district court's views, expressed without benefit of a record, are as follows. First, "liquor, being subject to abuse, is more readily abused when readily available, and it is a matter of simple economics that, the lower the price of a commodity, the more readily available it is." Second, "problems of alcohol abuse have always been particularly acute and endemic among the poor, who are too easily and sorely tempted to escape their predicament through a bottle." Third, it is "reasonable for [Maryland] to foster the goal of temperance . . . by a [regulatory] mechanism that prohibits `price wars' among liquor dealers." This is self-evident, the district court indicated, because"[n]o one could argue that increased costs would not further at least some reduction in demand."
 
 
 43
 TFWS did not have the opportunity to challenge these observations and conclusions, and the company seeks to offer evidence and argument that Maryland's scheme does not promote temperance or serve any other legitimate purpose under the Twenty-first Amendment. In addition, our review of the cases, particularly those from the Supreme Court, indicates that courts do not evaluate the strength of a state's Twenty-first Amendment defense without the benefit of some record.
 
 
 44
 Balancing the federal interest of promoting competition against a state's interest under the Twenty-first Amendment can be ticklish business, but the Supreme Court has given us substantial guidance. The Court instructs us that when a state's Twenty-first Amendment interests conflict with federal power exercised under the Commerce Clause, courts must conduct a balancing test in a"`pragmatic effort to harmonize state and federal powers.'" 324 Liquor Corp. v. Duffy, 479 U.S. 335, 346-47 (1987) (quoting Ca. Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc., 445 U.S. 97, 109 (1980)). "The question in each case is `whether the interests implicated by a state regulation are so closely related to the powers reserved by the Twenty-first Amendment that the regulation may prevail, notwithstanding that its requirements directly conflict with express federal policies.'" Id. at 347 (quoting Capital Cities Cable, Inc. v. Crisp , 467 U.S. 691, 714 (1984)). This balancing is to be conducted with the further instruction that "[b]oth the Twenty-First Amendment and the Commerce Clause are parts of the same Constitution [and] each must be considered in light of the other and in the context of the issues and interests at stake in any concrete case." Bacchus Imports, Ltd. v. Dias, 468 U.S. 263, 275 (1984) (alterations in original) (quoting Hostetter v. Idlewild Bon Voyage Liquor Corp., 377 U.S. 324, 331-32 (1964)). The Supreme Court has said that Congress "`exercis[ed] all the power it possessed' under the Commerce Clause when it approved the Sherman Act." Midcal, 445 U.S. at 111 (alteration in original) (quoting Atlantic Cleaners and Dryers v. United States, 286 U.S. 427, 425 (1932)). As a result, "unsubstantiated state concerns" under the Twenty-first Amendment are not sufficient to trump the "goals of the Sherman Act;" a state must demonstrate that its liquor regulatory policies directly serve the interests it proffers under the Twenty-first Amendment. Id. at 114. See also 324 Liquor , 479 U.S. at 350 (rejecting New York's "unsubstantiated interest in protecting small retailers"). In the end, the state's interests must be of sufficient weight to "prevail against the federal interest in enforcement of the antitrust laws." 324 Liquor, 479 U.S. at 250 n.12.
 
 
 45
 There may be some question about what evidence or information is appropriate in reviewing a state's interests under the Twenty-first Amendment. The Supreme Court's review in these cases has gone beyond a consideration of the pertinent statutes and regulations. For example, in Midcal the Court, in concluding that California's retail price maintenance system for wine did not further its avowed Twentyfirst Amendment purposes of promoting temperance and an orderly market, considered information from a state court decision. This information included facts from (1) a state study analyzing liquor consumption while retail price maintenance was in effect and (2) a state agency decision that relied on a congressional study about the impact of fair trade laws on small retailers. See Midcal, 445 U.S. at 112-14. Likewise, in 324 Liquor the Supreme Court relied on "evidence in the record indicat[ing] that the number of retail liquor outlets in New York [was] continu[ing] to decline" in concluding that New York's expressed interest in protecting small retailers had not been substantiated. See 324 Liquor, 479 U.S. at 350. At least one circuit court, mindful of the Supreme Court's approach in Midcal and 324 Liquor, has observed that "the Twenty-first Amendment issue may ultimately rest upon findings and conclusions having a large factual component." Miller v. Hedlund, 813 F.2d 1344, 1352 & n.7 (9th Cir. 1987).
 
 
 46
 On remand Maryland should be given the opportunity to assert and substantiate its Twenty-first Amendment defense, and TFWS should be permitted to respond. The analysis the district court should undertake in analyzing Maryland's interest and then balancing it against the federal interest is straightforward. First, the court should examine the expressed state interest and the closeness of that interest to those protected by the Twenty-first Amendment. We acknowledge that little analysis is needed on this point. Temperance is the avowed goal of the Maryland regulatory scheme, and the Twenty-first Amendment definitely allows a state to promote temperance. Second, the court should examine whether, and to what extent, the regulatory scheme serves its stated purpose in promoting temperance. Simply put, is the scheme effective? Again, the answer to this question"may ultimately rest upon findings and conclusions having a large factual component." Miller, 813 F.2d at 1352. Finally, the court should balance the state's interest in temperance (to the extent that interest is actually furthered by the regulatory scheme) against the federal interest in promoting competition under the Sherman Act.
 
 IV.
 
 47
 In sum, we affirm in part, holding that TFWS's suit fits within the Ex parte Young exception to Eleventh Amendment immunity, that Maryland's liquor regulatory scheme is a hybrid restraint amounting to a per se violation of S 1 of the Sherman Act, and that Maryland cannot claim state action immunity. We vacate the order of dismissal, which afforded Maryland's regulatory scheme protection under the Twenty-first Amendment, and we remand for further proceedings on the Comptroller's Twenty-first Amendment defense.
 
 
 48
 AFFIRMED IN PART, VACATED IN PART, AND REMANDED
 
 LUTTIG, Circuit Judge, concurring:
 
 49
 I agree with the majority that TFWS' suit is not barred by the Eleventh Amendment and that it is inappropriate on the record before us to decide the Twenty-First Amendment question. I also must ultimately agree with the majority that the Maryland statute at issue is preempted by the Sherman Act as a hybrid restraint of trade -at least under the authority of the Supreme Court's decision in 324 Liquor v. Duffy, 479 U.S. 335 (1987). I believe it possible, however, although the State of Maryland certainly does not make the argument, that the Supreme Court in 324 Liquor misunderstood its own prior precedents in Fisher v. City of Berkeley , 475 U.S. 260 (1986), Schwegmann Bros. v. Calvert Distillers Corp. , 341 U.S. 384 (1951), and California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc., 445 U.S. 97 (1980), in holding that the regulations in that case in fact constituted a so-called hybrid restraint. Under a proper understanding of the precedents upon which 324 Liquor itself was assertedly based, I believe that the regulations at issue in that case-like those in the case before us -represent classic unilateral state action, which is, of course, exempt from the Sherman Act.
 
 
 50
 As the Supreme Court explained in Fisher,"there can be no liability under S 1 [of the Sherman Act] without an agreement." Fisher, 475 U.S. at 266. Thus, in that case, the Court held that a local ordinance establishing rent controls did not violate the Sherman Act because the ordinance constituted unilateral action by the government, with no agreement between private parties. Id. at 269-70. And the Court distinguished Schwegmann and Midcal as cases that involved not unilateral action, but, rather, "hybrid" restraints, "where private actors [were] . . . granted a degree of private regulatory power," and state-imposed "nonmarket mechanisms . . . enforce[d] private marketing decisions." Id. at 268-69. That is, in the Louisiana and California schemes at issue in those cases, private parties independently reached pricing agreements, which the state then authorized and enforced.*
 
 
 51
 Here, as in Fisher, I believe the Maryland statute is unilateral action because there is no voluntary agreement, independently reached, between private parties that is either authorized or enforced by the state. In fact, there is no "agreement" at all. Rather, and simply, the state imposed requirements upon the private wholesalers unilaterally, that they post and hold, and refrain from volume discounts -requirements which we have no reason to think they themselves would have agreed to independently. For this reason, the Maryland regulations are materially distinguishable from those at issue in Schwegmann and Midcal, in which state action cloaked affirmative, private, anticompetitive business agreements.
 
 
 52
 I must acknowledge, however, that the Maryland regulations before us are not materially different from the regulations in 324 Liquor, and consequently that the majority cannot be faulted for its conclusion that the former may be properly considered forms of hybrid restraint. But I cannot help but wonder whether the Court in 324 Liquor misunderstood its own precedents in Fisher, Schwegmann, and Midcal, in holding that the New York regulations then before the Court really were hybrid, as opposed to unilateral, restraints. The Court's very brief textual and footnote treatment of the question of whether there was a `contract, combination . . . or conspiracy in restraint of trade,'" bordered on the perfunctory. See 324 Liquor, 479 U.S. at 345 & n.8 (quoting 15 U.S.C. S 1). And the Court did not even attempt to compare and contrast the New York regulations with the various regulatory schemes at issue in Fisher, Schwegmann, and Midcal. It invoked its observation in Fisher that private actors had been granted "`a degree of private regulatory power,'" id. at 345 n.8 (quoting Fisher, 475 U.S. at 268), and it seemed thereafter simply to assume uncritically that private parties before them actually had been afforded "a degree of private regulatory power" of the kind that the Court said would be prohibited in Fisher and held was prohibited in Schwegmann and Midcal.
 
 
 53
 The wholesalers in 324 Liquor indeed did possess "a degree of private regulatory power" as a result of the New York regulation, as do the wholesalers in the present case. But it was not, there, and it is not here, the kind of private regulatory power referenced in Fisher and proscribed in Schwegmann or Midcal. The private regulatory power at issue in those cases was the power of private parties independently to set prices via an agreement -that is, via concerted action. No comparable power was conferred upon the private parties by the state in 324 Liquor. Nor is any such power exercised or authorized here. In my view, this case, like 324 Liquor, involves classic unilateral state action -not hybrid state and private conduct-and Maryland's regulatory scheme should therefore not be subject to the Sherman Act.
 
 
 54
 I find confirmation of this in the fact that the observation made by the Court in Fisher to contrast the Berkeley regulations from those in Schwegmann and Midcal is equally apt here to distinguish the Maryland regulations from the typical hybrid restraint:
 
 
 55
 A restraint imposed unilaterally by government does not become concerted action within the meaning of the[Sherman Act] simply because it has a coercive effect upon parties who must obey the law. The ordinary relationship between the government and those who must obey its regulatory commands whether they wish to or not is not enough to establish a conspiracy.
 
 
 56
 Id. at 267.
 
 
 57
 I would not even raise the issue of the precedential correctness of 324 Liquor but for what I believe is its deceptive significance. Continuation of this interpretive error -if that it be-is not without consequence. Carried forward, what might be wholly unintended could result in significant areas of unilateral state action being regarded as hybrid state/private action, and therefore potentially in violation of the Sherman Act when it is not, and in derogation of what should be obvious state plenary authority.
 
 
 
 Notes:
 
 
 *
 In Schwegmann, a Louisiana statute authorized "a distributor and retailer to make a `contract' fixing the resale price" and enforced the contract even against a seller who was not a party to it. Schwegmann, 341 U.S. at 386-87 (emphasis added). Likewise, in Midcal, the challenged statute prohibited wine merchants from selling to retailers at a price other than that set "either in an effective price schedule or in an effective fair trade contract." Midcal, 445 U.S. at 99 (emphasis added).