C.A.DICKERSON, Roland R. Pennington, and David Vukovic, Plaintiffs,

v.

Doyne BAILEY, in his Official Capacity as Administrator of the Texas Alcohol Beverage commission, and John Cornyn, in his Official Capacity as Attorney General of the State of Texas, Defendants.

No. CIV.A.H–99–1247.

United States District Court, S.D. Texas, Houston Division.

July 17, 2002.

Mark C. Harwell, Cotham Harwell et al., Houston, TX, Sterling W. Steves, Sterling Steves PC, Fort Worth, TX, for plaintiffs.

Walter Reed Lockhoof, Asst. Atty General, Office of Attorney General, Austin, TX, for defendants.

## MEMORANDUM AND ORDER

HARMON, District Judge.

Pending before the Court in the above referenced action, seeking a declaratory judgment and injunctive relief in Plaintiffs C.A. Dickerson, Roland R. Pennington, and David Vukovic's challenge to the constitutionality of Texas' statutory ban on direct importation of out-of-state wine by Texas residents for personal consumption, are Plaintiffs' supplemental motion for summary judgment (instrument # 42) and a [supplemental] cross motion for summary judgment (instrument # 47) filed by Defendant Rolando Garza, successor to Doyne Bailey as Administrator of the Texas Alcohol Beverage Commission.[1]

On February 10, 2000, after reviewing the evolution of jurisprudence dealing with the relationship of the dormant commerce clause[2] and § 2 of the twenty-first

---

1. Defendant Attorney General John Cornyn was voluntarily dismissed from this action on August 10, 1999(# 16).

2. The Fifth Circuit has stated about the dormant commerce clause,

It is well settled ... that while [the Commerce Clause's] literal terms speak only of powers bestowed upon Congress, the clause also contains a "dormant" facet that serves as "a substantive restriction on permissible state regulation of interstate commerce." ... As the Supreme Court has emphasized, "this 'negative' aspect of the Commerce Clause prohibits economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by bur-

dening out-of-state competitors." ... The Court has also struck down state efforts to grant its own residents preferred rights of access over nonresidents to resources located within its borders. [citations omitted] *Cooper v. McBeath*, 11 F.3d 547, 552–53 (5th Cir.), *cert. denied*, 512 U.S. 1205, 114 S.Ct. 2675, 129 L.Ed.2d 810 (1994)(holding that the Texas Alcoholic Beverage Code's duration and citizenship requirements for permits under Texas' comprehensive regulatory scheme for distribution and sale of alcoholic beverages constitute economic protectionism and violate the dormant commerce clause).

amendment[3] in the course of the twentieth century, this Court reached the following conclusions: (1) that Texas Alcoholic Beverage Code Ann. § 107.07(a) and (f)(Vernon 1995 and Supp.1998)[4] facially violated the commerce clause of the federal constitution; (2) that the statute was not saved by the twenty-first amendment because its purpose was economic protection of the state's in-state liquor wholesalers, retailers, and wine industry at the expense of out-of-state wine sellers, while the statute failed to serve the legitimate goal of temperance; and (3) that Plaintiffs' motion for summary judgment should be granted and Defendant's cross motion, denied (# 24). The discussion of the law in that memorandum and order is hereby incorporated into this one.

After the Court issued its decision, the Seventh Circuit, reversing a district court case[5] relied upon by this Court, concluded that an Indiana statute prohibiting direct shipments from out-of-state sellers of alcoholic beverages directly to Indiana consumers was within the powers delegated to the state in § 2 of twenty-first amendment. *Bridenbaugh v. Freeman–Wilson,* 227 F.3d 848 (7th Cir.2000), *cert. denied sub nom. Bridenbaugh v. Carter,* 532 U.S. 1002, 121 S.Ct. 1672, 149 L.Ed.2d 652 (2001).

This Court's memorandum and order and Judge Frank Easterbrook's opinion in *Bridenbaugh* appear to have motivated both sides to reframe their claims. The Court granted Defendant's motion to reconsider to allow further briefing on *Bridenbaugh* and any additional new cases, as well as the Twenty-first Amendment Enforcement Act, Pub.L. 106–386, codified at 27 U.S.C. § 122a, enacted on October 26, 2000 and effective January 25, 2001,[6] and an accompanying statement of legislative intent by the bill's sponsor, Senator Orrin Hatch, which Defendant characterized as a "wholesale adoption of both the holding and reasoning of" Judge Frank Easterbrook's opinion in *Bridenbaugh,* 227 F.3d 848.

Furthermore, the Court also granted Plaintiffs' motion for leave to amend their complaint.[7] Plaintiffs complained that only after this Court issued its summary judgment, did Defendant for the first time, in his motion to reconsider (# 30, pars.19–24, 26–28), contend that the prohibition against direct shipment of wine by out-of-

3. Section 2 states, "The transportation or importation into any state, territory, or possession of the United States for delivery or use therein of intoxicating liquors in violation of the laws thereof, is hereby prohibited." U.S. Const. amend. XXI, § 2.

4. § 107.07, in relevant part, provides,

    (a) . . . A Texas resident may import for his own personal use not more than three gallons of wine without being required to hold a permit. . . . A person importing wine under this subsection must personally accompany the wine . . . as it enters the state. . . . (f) Any person in the business of selling alcoholic beverages in another state or country who ships or causes to be shipped any alcoholic beverage directly to any Texas resident under this section is in violation of this code.

5. *Bridenbaugh v. O'Bannon,* 78 F.Supp.2d 828 (N.D.Ind.1999)(holding that the statute violated the dormant commerce clause because permits to distribute alcohol in Indiana were not given to out-of-state residents and that the statute's purpose was not temperance, the core concern of the twenty-first amendment).

6. The Twenty–First Amendment Enforcement Act comprised § 2004 of the Victims of Trafficking and Violence Protection Act of 2000, Pub.L. 106–386, 114 Stat, 1464, amending the Webb Kenyon Act by providing a civil cause of action to state Attorneys General in federal court to seek injunctive relief barring interstate shipments of liquor if such shipments violate the law of the receiving state.

7. Plaintiffs' First Amended Complaint is designated as instrument # 40.

state wineries to ultimate-consumer, in-state residents also applies to in-state wineries under the Texas Alcoholic Beverage Code.[8] In essence, Defendant argued that because both in-state and out-of-state wineries are treated in the same way, there is no discrimination.

Subsequently, however, Texas enacted the Texas Wine Marketing Assistance Program Act ("Marketing Act"), Tex. Alco. Bev.Code §§ 110–001–110.055 (West Supp. 2002), effective as of September 1, 2001. Quoting the purpose statements[9] from the legislative bills underlying the Marketing Act in their motion for leave to amend, Plaintiffs argued that the new statute "assist[s] Texas wineries in capturing a greater part of the market for wine, at the expense of out-of-state wineries" and confirms Plaintiffs' contention that "the Texas legislative scheme banning the shipment of wine in Texas represents point-blank discrimination between in-state and out of

**8.** At that point of the litigation, Plaintiffs had not raised a constitutional challenge to any provisions other than § 107.07(a) and (f).

Defendant's motion to reconsider argued that under § 107.05(a), no person may import any liquor into Texas and deliver it to a person not authorized to import it. Defendant explained that under Chapter 37 of the Texas Alcoholic Beverage Code an out-of-state winery must obtain a permit from Texas allowing it to sell wine only to a person authorized to import wine into Texas (i.e., the holder of a non-resident seller's permit under § 37.01 or a designated licensed broker holding a non-resident seller's permit under § 37.10). Furthermore, "under § 6.01(a), the manufacture, sale, possession for the purpose of sale, importation, transportation and distribution of alcoholic beverages, which would include wine, is a privilege granted by the Code *only* for those who have first obtained a license or permit of the proper type." Motion to reconsider at 2. This right or privilege is an explicit exception to prohibitions established elsewhere in the Code. § 11.01(c). Noting that in-state winery permits are governed by Chapter 16, Defendant highlighted § 16.01(a)(4), which requires that permitted Texas wineries sell to ultimate consumers only on their own premises, in unbroken packages, for consumption off the premises, and in a quantity not to exceed 25,000 gallons annually. He concluded that when Chapter 16 is read in conjunction with § 11.01(c), it is evident that in-state wineries may not ship wine directly to Texas consumers.

**9.** Plaintiffs quote from H.B. 892 77(R) Bill Analysis under the paragraph entitled, "DIGEST AND PURPOSE":

The growth of the Texas wine industry has had a positive impact on the Texas economy. California produces many times the amount of wine Texas produces, but consumes only a fraction more than Texas consumes. Texas is a significant consumer of wine, but demand is not being supplied by Texas wineries. H.B. 892 allows Texas wineries increased access to the Texas market and provides consumers with better access to Texas wines.

Plaintiffs also submit "HB 892–STATEMENT OF LEGISLATIVE INTENT," in which House Agriculture and Livestock Committee Chairman David Swinford states that the new marketing program establishes a fund of $250,000 each year in order to "promote Texas wines."

Both documents are attached to Declaration of Mark C. Harwell (# 43).

The Court further notes that § 110.002 of the Marketing Act expressly states, "The Texas Wine Marketing Assistance Program is established in the Department of Agriculture to assist the Texas wine industry in promoting and marketing Texas wines and educating the public about the Texas wine industry." *Inter alia,* the program "organize[s] a network of package stores to participate in a program promoting wines produced in this state and to deliver wine to consumers under Section 110.053; ... develop[s] and maintain[s] a database of wineries in this state ...; operate[s] a toll-free telephone number to ... receive inquiries from persons who wish to purchase a particular wine produced in this state; ... refer a person who wishes to purchase a Texas wine to the winery that produces the wine and inform the person of arrangements that the person can make under Section 110.053 to pick up the wine at a package store or have the wine delivered to the person's address; ... [and] promote wineries in this state ...."

state commerce." Plaintiffs' motion for leave to amend at 2, 1. They focus upon Texas Alcoholic Beverage Act § 110.053 (when person is physically present at the winery, he may ship wine in accordance with § 107.12; when the person is not physically present at the winery, he may order the winery to ship wine to a participating package store near the consumer where the consumer may pick it up or the consumer may arrange with the package store to have it shipped by that store to the purchaser's home). Section 107.12, entitled "Direct Shipment of Wine," provides,

> Notwithstanding Section 107.07, a person who purchases wine while at a winery located in this state may ship or cause to be shipped the wine to the person's residence if the winery verifies that the person purchasing the wine is 21 years of age or older. The person must be present when the wine is delivered to the person's residence.

The Texas Alcoholic Beverage Code thus allows consumers to purchase wines from Texas wineries and to have the wines shipped to their homes, but expressly forbids such activity with respect to out-of-state wineries. *Id.* In other words, according to Plaintiffs, in the Marketing Act the Texas Legislature ratified the purpose of economic protectionism of § 107.07 of the Texas Alcoholic Beverage Code.

In addition, Plaintiffs' amended pleading expands the scope and clarifies the nature of the relief they seek with respect to the Texas Alcoholic Beverage Code as a whole. In addition to their allegation that § 107.07(f) is unconstitutional on its face, Plaintiffs now charge that other portions of the Act and the structure of other "duplicative" statutes or regulations to the extent that they restrict Plaintiffs' right to order directly out-of-state wines to be shipped to their homes for their personal consumption, are unconstitutional as applied. These duplicative statutes include Tex. Alco. Bev.Code §§ 6.01 (permitting

*inter alia* importation of alcoholic beverages only if the person importing has first obtained a license or permit); § 11.01 (outlawing the importation of liquor, including wine, without a permit); § 37.03 ("A nonresident seller's permit is required of any distillery, winery, importer, broker, or person who sells liquor to permittees authorized to import liquor into this state, regardless of whether the sale is consummated inside or outside the state."); § 107.05(a) ("No person may import liquor into the state and deliver it to a person not authorized to import it."); and § 107.07(a) (permitting nonpermitted individuals to bring no more than three gallons of wine into the state and may do so only if the wine is personally transported over the border).

This Court has reviewed the extensive briefing submitted since the motion to reconsider was granted and has conducted its own research into the issues before it. Because the issues are essentially matters of law, rather than repeating arguments of the parties the Court presents its analysis, conclusions, and the reasoning underlying its determinations.

As a threshold matter, the Court concludes that the Twenty-first Amendment Enforcement Act, 27 U.S.C. § 122a, amended the Webb Kenyon Act merely by providing a civil cause of action to state Attorneys General in federal court to seek injunctive relief barring interstate shipments of liquor if such shipments violate the law of the receiving state. Section (e) provides in pertinent part,

> This section shall be construed only to extend the jurisdiction of Federal courts in connection with State law that is a valid exercise of power vested in the States—
>
> > (1) under the twenty-first article of amendment to the Constitution of the United States as such article of

amendment is interpreted by the Supreme Court of the United States including interpretations in conjunction with other provisions of the Constitution of the United States; ...

This Court finds that the plain language of the statute makes it clear that this statute merely created a federal forum for obtaining injunctive relief where constitutionally valid state statutes regulating importation and distribution of alcoholic beverages may be enforced, and it does not affect the determination of whether such a statute passes constitutional muster. *See, e.g., Bolick v. Roberts*, 199 F.Supp.2d 397, 412–13 (E.D.Va.2002).

Furthermore, as evidenced by the text, there is no evidence supporting Defendants' contention that Senator Orrin Hatch represented that the new act is a wholesale adoption of Judge Easterbrook's opinion in *Bridenbaugh*. Senator Hatch even states that the Senators "worked hard with representatives of the wineries on language to further clarify that this bill does not, even unintentionally, somehow change the balancing test employed by the Courts in reviewing State Liquor laws. We were able to reach agreement and incorporated those changes in the bill." Statement of Sen. Orrin G. Hatch at 1. As will be discussed, Judge Easterbrook eschewed mentioning, no less, utilizing that balancing test. While Senator Hatch personally praises Judge Easterbrook's opinion, he makes clear that the new legislation serves to provide a federal forum to enforce valid laws of the state receiving shipments of alcohol without "jurisdictional roadblocks," something lacking under the Webb–Kenyon Act. *Id.* at 3–4 ("The legislation passed today removes that impediment to state enforcement simply by providing the Attorney General of a State, who has reasonable cause to believe that his or her State laws regulating the importation and transportation of alcohol are being violated, with the ability to file an action in federal court for any injunction to stop those illegal shipments.").

The question of the constitutionality of state bans on direct importation of wine by in-state consumers from out-of-state wineries has become increasingly controversial,[10] yet thus far there is minimal case law dealing with the question. The Supreme Court has not specifically addressed state bans on direct importation of wine, and the only appellate court to do so is the Seventh Circuit in *Bridenbaugh*. Thus district courts facing challenges to such laws must look for guidance to case law addressing more generally the dormant commerce clause and its complex relationship to the twenty-first amendment. It quickly becomes apparent that this is a gray area of law, without bright lines and clear rules, as well as a constantly evolving one. There is little agreement on what approach should be taken. Court opinions in recent years vary widely, to some degree depending upon (1) whether the judge interprets the amendment as providing nearly absolute plenary power to the

---

**10.** A number of factors have coalesced to give rise to increasing challenges to state laws banning direct shipment of out-of-state wines to consumers. James Molnar's Comment, *Under the Influence: Why Alcohol Direct Shipment Laws Are a Violation of the Commerce Clause*, 9 U. Miami Bus. L.Rev. 169, 172–74 (2001), discusses several, including massive consolidation of wholesalers in the liquor distribution industry which then sought to protect their lucrative business and thwart competition by lobbying for protectionist state laws; a boom in the wine industry giving rise to many small, family-run wineries with limited production that could not lure the large wholesalers nor pay the costs of middlemen; the rise of the Internet, over which consumers can order nearly any legal product and which allowed wine enthusiasts to locate hard-to-find wines and seek shipments; and the creation of "wine-of-the-month" type clubs.

states under § 2 of the twenty-first amendment to establish a comprehensive regulatory system to achieve legitimate state interests in promoting temperance, raising revenue, and insuring orderly market conditions and view any inequitable results as inconsequential, incidental, and minor burdens on commerce, or (2) whether the judge applies more recent Supreme Court developments in dormant commerce clause analysis and balancing tests and gives prominence to economic discrimination resulting from a state's disparate application of its regulatory scheme to favor local producers over out-of-state producers, in particular smaller wineries and wine sellers. The latter group seek to balance and harmonize the relationship between § 2 and the dormant commerce clause, to serve the federal interest in free competition as well as the state's interest in regulating to protect its citizens' health and welfare and its right to raise revenue through taxation. If the second group, highlighting the limitations on the states' powers under the twenty-first amendment imposed by the dormant commerce clause, find the effect of the state law facially discriminates against out-of-state sellers of liquor, they then examine whether the statute's purposes, explicit or implicit, fall within the legitimate, nonprotectionist core powers impliedly granted to the states in

§ 2 of the amendment, and thus "saving" the statute from being invalidated by the dormant commerce clause. Among the unsettled questions in this approach is the extent to which courts may go behind the expressed purpose of the legislature in passing such laws to determine if the actual motive is impermissible economic protectionism.

As the only appellate case addressing a state ban on direct importation and distribution of wine from out-of-state producers, Judge Easterbrook's opinion in *Bridenbaugh* is an appropriate starting point for examination of the debate and falls within the first approach discussed.

Like Texas and most other states, Indiana has a three-tiered system, composed of manufacturers/suppliers, distributors, and retailers,[11] for the distribution of alcohol within the state to effectuate what Judge Easterbrook bluntly characterizes as " 'orderly market conditions'—a euphemism for reducing competition and facilitating tax collection." *Bridenbaugh*, 227 F.3d at 851, Title 7.1 of the Indiana Code. Under the statute in dispute,[12] which is similar to the Texas statute, Indiana prohibits all direct shipments by any "person in the business of selling alcoholic beverages in another state or country" from making direct shipments of alcohol

---

**11.** During Prohibition, when liquor producers owned retail outlets, organized crime created and controlled illegal liquor enterprises. After the eighteenth amendment was repealed, in an effort to protect the liquor industry from domination by the mobs, states passed "Tied–House Laws" that established three-tiered systems, allowing producers of alcoholic beverages to sell only to state-licensed wholesalers, which in turn could sell only to state-licensed retailers, which then sold the liquor to consumers. States then also passed direct shipment laws limiting the ability of out-of-state producer or retailer to sell liquor directly to the consumer to protect their three-tiered systems. Typically such three-tiered systems require participating manufactur-

ers/sellers, wholesalers, and retailers to obtain licenses. *See, e.g.,* Duncan Baird Douglass, Note, *Constitutional Crossroads: Reconciling the Twenty-first Amendment and the Commerce Clause to Evaluate State Regulations of Interstate Commerce in Alcoholic Beverages,* 49 Duke L.J. 1619, 1621 (2000); John Foust, Note, *State Power to Regulate Alcohol under the Twenty-first Amendment: The Constitutional Implications of the Twenty-first Amendment Enforcement Act,* 41 B.C.L.Rev. 659, 666 (2000); James Molnar, Comment, *Under the Influence: Why Alcohol Direct Shipment Laws are a Violation of the Commerce Clause,* 9 U. Miami Bus. L.Rev. 169, 171–72 (2001).

**12.** Ind.Code Ann. § 7.1–5–11–1.5(a).

from out of state to Indiana consumers, but allows "local wineries, but not wineries 'in the business of selling ... in another state or country,' to ship directly to Indiana consumers."[13] *Id.* at 849, 851. The plaintiffs in *Bridenbaugh* were individual consumers who argued that the statute violated the dormant commerce clause because it restricts only out-of-state sellers of wine from shipping directly to Indiana consumers.

Identifying as the issue before the court whether § 2 of the twenty-first amendment shields the Indiana statute from "what would otherwise be its fate under dormant commerce clause jurisprudence,"[14] Judge Easterbrook, writing for himself and one other judge,[15] began by emphasizing, and thereby revealing his own leaning, that this case "pits" the express grant of plenary power to the state under the twenty-first amendment to control the importation and distribution of liquor within its borders against the "inference" that the power granted to Congress under Article I § 8 cl. 3 ("Congress shall have the power to regulate commerce ... among the several states.") imposes restrictions on the states in their exercise of that authority under the amendment. *Id.* at 849.

The key to understanding and evaluating Judge Easterbrook's ruling is his statement that it is based on the history of the twenty-first amendment, which he limits to before and around the time of its enactment, and on the language of § 2. 227 F.3d at 851 ("our guide is the text and history of the Constitution"). Both bases of interpretation are problematic.

The plain meaning of § 2 ("The transportation or importation into any State, Territory or possession of the United State for delivery therein of intoxicating liquors, in violation of the laws there of, is hereby prohibited.") is anything but plain with respect to the language used and the historical context, as evidenced by conflicting views of courts and legal scholars throughout the twentieth century. Interpretations of the text of § 2 range from the broad construction that it provided the states with full power over commerce involving liquor, unrestrained by other constitutional provisions or the earlier nondiscrimination principal in the Wilson Act, to merely returning to the states the powers they had under the law before the eighteenth amendment prohibited all trade in alcoholic beverages.

A review of the ratification debates explains why Judge Easterbrook did not discuss them in attempting to interpret § 2. In a detailed examination of that legislative history of the amendment, Duncan Baird Douglass, in a Note, *Constitutional Crossroads: Reconciling the Twenty-first Amendment and the Commerce Clause to Evaluate State Regulation of Interstate Commerce in Alcoholic Beverages,* 49 Duke L.J. 1619, 1628–36 (April 2000), demonstrates how comments of various senators during the ratification debates support three different interpretations of § 2:(1) as "[t]he most restrictive ... section two did not exempt the states from any provisions of the Constitution, but

---

**13.** As noted, under Texas' new Marketing Act, Texas wineries may now ship directly to Texas customers, but out-of-state wineries may not.

**14.** *Id.* at 851. Judge Easterbrook emphasizes that were the product being imported "cheese rather than wine, Indiana would not be able to close its borders to imports or to insist that

the shippers collect its taxes, despite the effect on its treasury" because there would be no twenty-first amendment power to save the statute from commerce clause invalidation. *Id.*

**15.** Judge Kane recused himself from the panel. 227 F.3d at 848–49 n. *.

merely returned authority to regulate commerce in intoxicating liquors to the states"; (2) section two "was included in the Amendment solely to ensure that the states wanting to remain dry after repeal of the Eighteenth Amendment would have the power to enact laws to do so"; and (3) "most expansive ... that it entirely exempted state regulation of commerce in alcoholic beverages from the limitations of the Commerce Clause ...." *Id.* at 1631. Based on his review of the ratification debates, Douglass concluded,

> The Twenty-first Amendment garnered the requisite two-thirds vote in each house of Congress without raising much substantive debate, probably because most members of Congress saw section one, the simple repeal of constitutional Prohibition, as the bulk of the Amendment's purpose and substance. It seems that sections two and three of the Amendment were seen as being primarily procedural sections, necessary to support and implement section one. What substantive debate there was regarding the formulation of the Amendment focused principally on two subjects: whether the text should explicitly prohibit saloons and the means of ratifying the Amendment. The meaning of the provision that became section two of the Twenty-first Amendment was subjected to limited scrutiny.

*Id.* at 1631–32. Douglass summarized, "The plain meaning of the text and the legislative history, taken together, do not reveal a single, correct interpretation of the effect the Amendment had on state authority to regulate commerce in alcoholic beverages following the repeal of Prohibition," and therefore, "[a]bsent definitive guidance on the issue from the text or history of the Twenty-first Amendment," the task of interpreting it was left to the Supreme Court. *Id.* at 1636.

The twenty-first amendment's text and history were initially interpreted very expansively and subsequently increasingly narrowly with case-specific, intense factual analysis by the Supreme Court, as is evidenced by its evolving case law in this century. *See* this Court's memorandum and order of February 10, 2000 and footnote 16 of this memorandum and order. At first the high court construed the amendment as authorizing the states to regulate commerce in alcoholic beverages unfettered by the limitations of the dormant commerce clause. *State Board of Equalization v. Young's Market Co.*, 299 U.S. 59, 62, 57 S.Ct. 77, 81 L.Ed. 38 (1936)(twenty-first amendment "confer[s] upon the State the power to forbid all importations which do not comply with the conditions which it prescribes"); *Indianapolis Brewing Co. v. Liquor Control Comm'n*, 305 U.S. 391, 394, 59 S.Ct. 254, 83 L.Ed. 243 (1939)("Since the Twenty-first Amendment ... the right of a state to prohibit or regulate the importation of intoxicating liquor is not limited by the commerce clause ...."); *Ziffrin, Inc. v. Reeves*, 308 U.S. 132, 138, 60 S.Ct. 163, 84 L.Ed. 128 (1939)("The Twenty-first Amendment sanctions the right of a State to legislate concerning intoxicating liquors brought from without, unfettered by the Commerce Clause."). As the Court indicates in its discussions below, that view has undergone modification in recognition of some significant limitations placed on the states' regulation of the importation and distribution of alcohol by the commerce clause, among other constitutional provisions. *See, e.g., Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 274, 104 S.Ct. 3049, 82 L.Ed.2d 200 (1984)("Despite broad language in some of the opinions of this Court written shortly after ratification of the Amendment, more recently we have recognized the obscurity of the legislative history of § 2 .... No clear consensus concerning the meaning of the provision is apparent [citations and footnotes omit-

**682**

ted].").  Moreover, the legislative history of the ratification debates fails to reveal clearly any unified Congressional intent in enacting the section.

Judge Easterbrook resolved the constitutional challenge to the Indiana statute by broadly construing § 2 and focusing on what he views as Indiana's absolute right under the twenty-first amendment to regulate the importation and distribution of liquor to establish its three-tier system in order to collect tax revenue.  He did not mention, much less discuss, any incidental burdens on small out-of-state wineries or on Indiana consumers that might result from the regulatory process.  In his concentration on Indiana's three-tiered scheme, which he viewed as fully authorized by the powers granted to the state under the twenty-first amendment, he did not discuss the last forty years of Supreme Court jurisprudence relating to balancing and harmonizing the dormant commerce clause and § 2 of the twenty-first amendment.  Judge Easterbrook thus also rejected the reasoning of opinions based on analysis of the "core concerns" of the twenty-first amendment, e.g., promoting temperance, raising revenue, and insuring orderly market conditions, which would include this Court's February 10, 2000 memorandum and order.[16]

---

**16.** As background to understanding Judge Easterbrook's opinion, this Court briefly summarizes some key decisions in evolution of twenty-first amendment jurisprudence in the last thirty years.

In *Capital Cities Cable v. Crisp*, 467 U.S. 691, 104 S.Ct. 2694, 81 L.Ed.2d 580 (1984), although not a liquor importation or commerce clause case, the Supreme Court found that a state ban on alcohol advertising conflicted with regulations of the Federal Communications Commission. Because a conflict existed, the high court applied a balancing test to determine whether the state interest outweighed the federal interest, i.e., "whether the interests implicated by a state regulation are so closely related to the powers reserved by the Twenty–First Amendment that the regulation may prevail, notwithstanding that its requirements directly conflict with express federal policies." *Id.* at 694, 104 S.Ct. 2694. The Supreme Court concluded that the state law banning alcohol advertising did not directly relate to the core power of the twenty-first amendment "to control … whether to permit importation or sale of liquor and how to structure the liquor distribution" or to regulate "the times, places and manner under which liquor may be imported and sold" in the state. *Id.* at 715, 716, 104 S.Ct. 2694.

A few days later, in *Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 104 S.Ct. 3049, 82 L.Ed.2d 200 (1984), the Supreme Court, in its continuing effort to balance federal interests in free trade and a competitive economy with state interests, addressed the imposition of an excise tax on alcohol by the Hawaii Legislature, to which Hawaii granted in-state exemptions with the express purpose of protecting its local alcohol industry. Hawaii claimed that the twenty-first amendment allowed it to impose what in effect was a discriminatory tax and that the twenty-first amendment "saved" the law even though on its face the law violated the dormant commerce clause. The Supreme Court concluded that the law did violate the dormant commerce clause and therefore addressed the question whether the twenty-first amendment "saved" the statute in spite of the commerce clause violation. The Court weighed the federal interest, embodied in the dormant commerce clause, in preventing "economic Balkanization" against Hawaii's interest in protecting and promoting its wine industry, compared the purpose of the law (or the motivation of the Hawaii Legislature) to the purpose of the twenty-first amendment, and held that economic protectionism was not a "core purpose" of the twenty-first amendment. *Id.* at 276, 104 S.Ct. 3049 ("State laws that constitute mere economic protectionism are therefore not entitled to the same deference as laws enacted to combat the perceived evils of unrestricted traffic in liquor"). Therefore it concluded that the statute was not "saved" by § 2 of the twenty-first amendment. Moreover, the Supreme Court made clear that the twenty-first amendment did not entirely remove state regulation of alcoholic beverages from the ambit of the § 2: "[B]oth the Twenty-first Amendment and the Commerce Clause are parts of the same Constitution [and] each must be considered in light of the other and in the context of the

Reviewing the growing temperance movement in the late nineteenth and early twentieth centuries in the United States, Judge Easterbrook pointed out that before passage of the eighteenth amendment and the Volstead Act, which banned alcoholic beverages throughout the country, states were able to enforce their own temperance

issues and interests at stake in any concrete case." *Id.* at 275, 104 S.Ct. 3049, *quoting Hostetter v. Idlewild Bon Voyage Liquor Corp.,* 377 U.S. 324, 332, 84 S.Ct. 1293, 12 L.Ed.2d 350 (1964).

Furthermore, the Supreme Court has consistently indicated that a court must apply strict scrutiny when examining claims under the dormant commerce clause, requiring the state to demonstrate that its regulations are closely related to its powers reserved by the twenty-first amendment and that the statutes promote core concerns of that amendment. *See, e.g., City of Philadelphia v. New Jersey,* 437 U.S. 617, 624–27, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978); *Bacchus Imports,* 468 U.S. at 271, 104 S.Ct. 3049.

Among cases dealing only with the commerce clause and not its relationship to the twenty-first amendment, in *Brown–Forman Distillers Corp. v. N.Y. State Liquor Authority,* 476 U.S. 573, 106 S.Ct. 2080, 90 L.Ed.2d 552 (1986), the Supreme Court stated, "When a statute directly regulates or discriminates against interstate commerce or when its effect is to favor in-state economic interests over out-of-state interests, we have generally struck down the statute without further inquiry." *Id.* at 578–79, 106 S.Ct. 2080. In contrast, if a statute only indirectly affects interstate commerce and "regulates even handedly," the court should examine whether the State's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits. *Id.* No matter whether the discrimination is direct or indirect, a determination for which "there is no clear line," the Supreme Court concluded that "the critical consideration is on the overall effect of the statute on both local and interstate activity." *Id.* See also *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970)(When the statutory scheme is facially neutral or merely affects interstate commerce indirectly or incidentally, the court must apply a balancing test and determine if the burden on commerce is "clearly excessive in relation to the putative local benefits."). In *New Energy Co. of Indiana v. Limbach,* 486 U.S. 269, 278, 108 S.Ct. 1803, 100 L.Ed.2d 302 (1988), the Court pronounced that only where the challenged law advances a legitimate local interest within the state's power

under § 2 and where that interest cannot be adequately served by reasonable, nondiscriminatory alternatives will the statute be upheld. Furthermore, although the party challenging a statute initially has the burden of showing discrimination, once it has done so the State must justify that discrimination not only by identifying legitimate local benefits, but also showing the unavailability of nondiscriminatory alternatives to protect those local interests. *Hughes v. Oklahoma,* 441 U.S. 322, 335, 99 S.Ct. 1727, 60 L.Ed.2d 250 (1979). In addition, the court is not bound by the legislature's name, description, or characterization of the statute, but must apply the strictest scrutiny to see if protectionism is involved. *Id.* at 336, 99 S.Ct. 1727. Moreover, the Court has recognized the "cardinal principle that a State may not 'benefit in-state economic interests by burdening out-of-state competitors.'" *West Lynn Creamery v. Healy,* 512 U.S. 186, 199, 114 S.Ct. 2205, 129 L.Ed.2d 157 (1994), *quoting Limbach,* 486 U.S. at 273–74, 108 S.Ct. 1803.

In *North Dakota v. United States,* 495 U.S. 423, 432, 110 S.Ct. 1986, 109 L.Ed.2d 420 (1990), the Court found that North Dakota's reasons for enacting its regulatory system were legitimate goals within the state's core power under the twenty-first amendment: "promoting temperance, ensuring orderly market conditions, and raising revenue."

In *Bridenbaugh,* rejecting as subjective the core-concerns approach that required a court to determine the intent of the lawmakers in enacting a statute, Judge Easterbrook wrote, "If 'core concerns' spelled the difference, we would follow the Supreme Court rather than district courts and student notes. But our guide is the text and history of the Constitution, not the 'purposes' or 'concerns' that may or may not have animated its drafters. Objective indicators supply the context for § 2; suppositions about mental processes are unilluminating." 227 F.3d at 851. In essence, Judge Easterbrook did not apply the second step of the balancing approach of the Supreme Court, culminating in the test put forth in *Bacchus,* and returned to the high court's view of § 2 immediately following its enactment.

laws only against in-state sellers because courts regularly prohibited them from regulating liquor from other states and countries as impermissibly burdening interstate commerce in violation of the commerce clause of the federal constitution, which "effectively favored out-of-state sellers" in a kind of "reverse discrimination." *Id.* at 852. Congress accordingly passed the Wilson Act, 26 Stat. 313 (1890),[17] allowing states to regulate in-state sales of liquor imported from out of state "to the same extent and in the same manner as though such liquids or liquors had been produced in such State or Territory ...." The statute, however, did not reach direct shipments through mail order to consumers, since there was no in-state sale for regulation by the state.[18] In 1913, in an attempt to remedy the problem, Congress passed the Webb–Kenyon Act, 37 Stat. 699,[19] which in essence "federalized" state prohibitions and provided that " 'the shipment or transportation [into a state] ... of any

... liquor ... [which] is intended, by any person interested therein, to be received, possessed, sold, or in any manner used, either in the original package or otherwise, in violation of any law of such State ... is hereby prohibited.' " *Id.* at 852.[20] Congress, however, did not repeal the Wilson Act, with its principle of nondiscrimination.

The temperance movement continued to build in power, and the eighteenth amendment, prohibiting the manufacture and sale of liquor throughout the United States, was ratified. In 1933, § 1 of the twenty-first amendment repealed the eighteenth amendment, while § 2, according to Judge Easterbrook, "tracks the language of the Webb–Kenyon Act and effectively incorporates its approach into the Constitution" so that "[n]o longer may the dormant commerce clause be read to protect interstate shipments of liquor from regulation," including "direct shipments from out-of-state sellers to consumers that bypass state regulatory (and tax) systems."

**17.** In *Bowman v. Chicago and Northwestern Railway Co.*, 125 U.S. 465, 8 S.Ct. 689, 31 L.Ed. 700 (1888), the Supreme Court ruled that the state's exercise of its police power to protect its citizens from the perceived evil of alcohol within its borders by requiring a license of anyone seeking to import alcohol not yet in the state impermissibly regulated interstate commerce and violated the dormant commerce clause. In *Leisy v. Hardin*, 135 U.S. 100, 10 S.Ct. 681, 34 L.Ed. 128 (1890), the Supreme Court held that alcohol in its original package imported from out of state was an article of interstate commerce beyond the regulatory reach of a state's law and sale of it in that state could not be prohibited.

In response to *Leisy*, pursuant to its commerce clause power, Congress enacted the Wilson Act (current version at 27 U.S.C. § 121 (1994))("[L]iquor ... transported into any State ... shall upon arrival in such State ... be subject to the operation and effect of the laws of such State ... enacted in the exercise of its police powers, to the same extent and in the same manner as though such ... liquors had been produced in such State ... and shall not be exempt therefore by reason of being introduced therein in original

packages."), allowing the States to regulate the sale of imported liquor to the extent that they regulated liquor manufactured within their borders, i.e., embodying a principle of nondiscrimination. The Supreme Court unanimously upheld the constitutionality of the Wilson Act in *Scott v. Donald*, 165 U.S. 58, 17 S.Ct. 265, 41 L.Ed. 632 (1897).

**18.** *Rhodes v. Iowa*, 170 U.S. 412, 421–22, 18 S.Ct. 664, 42 L.Ed. 1088 (1898)(holding that the Wilson Act applied only "upon [liquor's] arrival" inside the state, not at the state's border, and did not prohibit residents from importing liquor for their own use).

**19.** Currently at 27 U.S.C. § 122 (1994), the Webb Kenyon Act provides, "The shipment ... of intoxicating liquor ... into any State ... in violation of the law of such State ... is hereby prohibited."

**20.** The Supreme Court upheld the constitutionality of the Webb–Kenyon Act in *James Clark Distilling Co. v. Western Maryland Ry. Co.*, 242 U.S. 311, 37 S.Ct. 180, 61 L.Ed. 326 (1917). *Bridenbaugh*, 227 F.3d at 852.

*Id.* at 853. He emphasized that "all 'importation' involves shipments from another state or nation. *Every* use of § 2 could be called 'discriminatory' in the sense that plaintiffs use that term, because every statute limiting importation leaves intrastate commerce unaffected. If that were the sort of discrimination that lies outside state power, then § 2 would be a dead letter." *Id.* at 853. In sum, "[l]ike the Wilson Act and the Webb–Kenyon Act before Prohibition, § 2 enables a state to do to importation of liquor—including direct deliveries to consumers in original packages—what it chooses to do to internal sales of liquor, but nothing more."[21] *Id.*

Focusing narrowly on the matter before him, Judge Easterbrook announced that "[n]o decision of the Supreme Court holds or implies that laws limited to the importation of liquor are problematic under the dormant commerce clause." *Id.* at 853. While acknowledging the principle of nondiscrimination embodied in the Wilson Act ("What the Court *has* held, however, is that the greater power to forbid imports does not imply a lesser power to allow imports on discriminatory terms," *Id.* at 853), he failed to apply strict scrutiny to the details of the regulatory system, but instead focused upon and affirmed the state's role to establish such a structure, regardless of the nature of the bricks that the state chose to build it. Turning to the Indiana statute, Judge Easterbrook concluded that § 2 of the twenty-first amendment authorizes the state to regulate such direct shipments to consumers unless it "uses its power to impose a discriminatory

condition ..., one that favors Indiana sources of alcoholic beverages over sources in other states, as Hawaii did in *Bacchus*." *Id.* Even though Indiana banned direct shipments of wine from out-of-state while allowing in-state wineries to make them, he found no discriminatory treatment under the Indiana statute because it "make[s] alcohol from every source equally amenable to state regulation." *Id.* at 853, 854.

Indiana insists that *every* drop of liquor pass through its three-tiered system to be subjected to taxation. Wine originating in California, France, Australia, or Indiana passes through the same three tiers and is subjected to the same taxes. Where's the functional discrimination? Plaintiffs observe that holders of Indiana wine wholesaler or retailer permits may deliver directly to consumers' homes.... But these permit holders may deliver California and Indiana wines alike; firms that do not hold permits may not deliver wine from either (or any) source; and even an Indiana citizen that is "in the business of selling alcoholic beverages in another state or country" is forbidden by § 7.1–5–11–1.5(a) to deliver wine directly from out of state to a consumer in Indiana, no matter the wine's source. (An Indiana citizen holding an Indiana permit may not, for example, make direct deliveries of Indiana's, or any other state's wines from a warehouse in Illinois. The wine must be reimported through an Indiana wholesaler or retailer.) *Id.* at 853–54.[22] He did not address the

---

**21.** Defendant argues that *Bridenbaugh* stands for the proposition that § 2 insulates the state from claims of discrimination based on its regulation of liquor imports and makes the challenged statute immune from dormant commerce clause challenges. The Court disagrees and points to this footnoted comment, indication that Judge Easterbrook recognizes there are restrictions on the state's power to

regulate under the dormant commerce clause, but he does not find significant instances of discrimination resulting from the complicated regulatory scheme created by Indiana.

**22.** Judge Easterbrook observed a seeming conflict between § 7.1–3–14–4(c), allowing an Indiana wine retailer in the business of selling alcoholic beverages in Illinois with a proper

fact that permitted in-state retailers could deliver wine directly to consumers' residences, but that out-of-state wineries had to go through licensed Indiana wholesalers, as long as every wine seller in some way was subjected to the three-tier regulatory system and got taxed at some point by the State. The plight of small, out-of-state wineries or the denial to Indiana residents of access to wines of small out-of-state vintners was apparently inconspicuous or insignificant to Judge Easterbrook.

Judge Easterbrook identified as the main effect of the challenged Indiana statute on the plaintiffs the imposition of taxes on their wine purchases from out of state. *Id.* at 854. Before the statute was enacted, sellers shipping directly to consumers in Indiana never paid any Indiana excise taxes, a situation that Judge Easterbrook likened to the "original package doctrine a century ago when states discriminated against in-state sellers, because they could not effectively govern direct shipments from elsewhere." *Id.* at 854.[23] The Webb–Kenyon Act and § 2 of the twenty-first amendment were designed to remedy this precise problem of "reverse discrimination." *Id.* at 852. Thus Judge Easterbrook concluded that the history of § 2 demonstrates that the statute, in "enabling

Indiana to collect its excise tax equally from in-state and out-of-state sellers," fulfills the purpose of the amendment. *Id.* Thus he determined that since the establishment of Indiana's three-tier system was fully authorized by the twenty-first amendment and was in some manner imposed on all sellers of wine, no further analysis was necessary.

In another recent case also concluding that such a direct import ban was constitutional but through a different approach, *Bainbridge v. Bush*, 148 F.Supp.2d 1306 (M.D.Fla.2001), the plaintiffs challenged Florida's direct importation law[24] allowing Florida wineries to obtain a vendor's license and sell wines directly to Florida residents, but not permitting out-of-state wineries to do the same, requiring out-of-state wineries to shoulder the expense of selling their products through Florida-licensed wholesalers and retailers. Judge James D. Whittemore found the challenged regulation "is virtually identical to the Indiana scheme upheld in *Bridenbaugh* in that nearly every drop of liquor passes through Florida's three-tiered system and is subject to taxation." *Id.* at 1314. The court determined that the law as applied to out-of-state wineries violated the dormant commerce clause, but was

---

permit to ship directly to Indiana consumers, and § 7.1–5–11–1.5, which forbids him to do so. He states that Indiana's courts have not yet considered whether these statutes can be reconciled, and that the Seventh Circuit did not address the question in *Bridenbaugh* because the plaintiffs are consumers "concerned only with direct shipments from out-of-state sellers who lack *and do not want* Indiana permits." 227 F.3d at 854.

**23.** Plaintiffs in the instant suit distinguish it from *Bridenbaugh* in part on the grounds that they are not "scofflaws" seeking to evade taxes, but only to order wine from out-of-state wineries, in particular from Wiederkehr Wine Cellars in Altus, Arkansas, and they argue that there are less burdensome methods for the

state to collect taxes than an outright ban on such shipments. Plaintiffs contend that, in contrast to the Indiana system, the Texas statute plainly discriminates against out-of-state wineries in favor of Texas wineries and that Texas does not require every drop of liquor to pass through its three-tiered system. They maintain that *Bridenbaugh* is inapplicable to their suit in Texas because the Indiana record is silent as to whether (1) Indiana discriminates against its citizens seeking to buy and have shipped to them wine from out-of-state wineries and (2) there is functional discrimination against small, out-of-state wineries in favor of local distributorship monopolies.

**24.** Codified at Florida Statutes §§ 561.54(1–2), 561.545(1).

nevertheless a constitutional exercise of Florida's sovereign regulatory power under the twenty-first amendment. *Id.* at 1308.

The Florida court emphasized that Florida "has 'virtually complete control' over the importation and sale of liquor and the structure of its liquor distribution system" and therefore its policies "have a strong presumption of validity." *Id.* at 1310, *citing North Dakota v. United States*, 495 U.S. 423, 431, 110 S.Ct. 1986, 109 L.Ed.2d 420 (1990) (plurality op.). Nevertheless, it applied the same analysis as this Court did in examining (1) whether Florida's statutory scheme violates the commerce clause, and if so, (2) whether it is saved by the twenty-first amendment. *Id., citing Dickerson v. Bailey*, 87 F.Supp.2d 691, 693 n. 2 (S.D.Tex.2000). The Florida court concluded that the scheme did violate the commerce clause by expressly prohibiting out-of-state wineries from shipping wine directly to Florida consumers because it forced the out-of-state wineries either to use a Florida wholesaler and retailer to market their wine in Florida or to not sell their wine in Florida and because there were nondiscriminatory alternatives to furthering the same state interests. *Id.* at 1311, 1312. It noted that favored in-state wineries have the alternative of becoming licensed vendors and thereby avoiding the greater burdens of the three-tiered systems. *Id.* at 1311 ("This favoring of in-state interests is the type of discriminatory regulation prohibited by the dormant commerce clause."), *citing Cooper v. McBeath*, 11 F.3d 547, 555 (5th Cir.1994). Moreover, unlike Judge Easterbrook's finding that there was no "functional discrimination" in Indiana's scheme, 227 F.3d at 853, the Florida court in *Bainbridge* noted, "Florida's statutory scheme also has the practical effect of preventing many small wineries from selling their wine in Florida ... because it is not cost-effective for the smaller-out of state wineries to acquire a Florida wholesaler." *Id.* at 1311 n. 7.

Nevertheless, the *Bainbridge* court observed that the kind of three-tier regulatory scheme established by Florida and numerous other states was held by the Supreme Court to be " 'unquestionably legitimate.' " *Id.* at 1312, *quoting North Dakota*, 495 U.S. at 432, 110 S.Ct. 1986. The Florida court therefore examined whether the statute or policy's discrimination in violation of the commerce clause was "saved" by falling within the "core concerns" of the twenty-first amendment: temperance, raising revenue, and ensuring orderly market conditions. *Id.* at 1313. First it found that Florida's express goals were to deal with what Florida perceived to be a "threat to the public health, safety and welfare; to state revenue collections; and to the economy of the state," all of which fall within the recognized core concerns. *Id.* at 1313. It also found convincing the arguments made by the State that invalidating the statute would hinder the State's ability to tax liquor sold within Florida. Nevertheless, although acknowledging that the statutory scheme "may have protectionist overtones," the Florida court followed *Milton S. Kronheim & Co., Inc. v. District of Columbia*, 91 F.3d 193, 203–04 (D.C.Cir.1996)(upholding a statute forbidding alcoholic beverage licensees from storing liquor outside the District of Columbia), *cert. denied*, 520 U.S. 1186, 117 S.Ct. 1468, 137 L.Ed.2d 681 (1997), which concluded that where there are mixed motives, both legitimate and protectionist, behind the enactment of a facially discriminatory statute regulating alcoholic beverages, the legitimate motives within the state's core enforcement powers over alcoholic beverages are sufficient to save the statute. The court concluded that "the numerous interests promoted by the Florida statutory scheme, including temperance, revenue protection, and the reduction of diversion and bootlegging [ ]

outweigh the minimal burden placed on interstate commerce." *Id.* at 1315.

In *Heald et al. v. Engler et al.*, No. 00–CV–71438, slip op., *1 (E.D.Mich. Oct. 1, 2001), the plaintiffs were comprised of "wine connoisseurs, wine journalists, and wine collectors" and one small California winery that challenged an aspect of Michigan's three-tier distribution system that prohibited manufacturers of alcoholic beverages, except for Michigan wineries, from shipping their products directly to Michigan consumers. Like Plaintiffs in the instant suit, the plaintiffs in *Heald* claimed "that this statutory scheme discriminates against out-of-state wineries, and interferes with the free flow of commerce, in violation of the dormant Commerce Clause," as well as "puts out-of-state wineries at a competitive disadvantage because they must incur the expense of channeling their wines through wholesalers and retailers, whereas in-state wineries may act as retailers and sell directly to Michigan consumers. The plaintiffs contended that many small, out-of-state wineries, which either cannot afford or choose not to pay this additional expense, are effectively excluded from the Michigan market," to the detriment of these wineries and of Michigan consumers wishing to purchase them. *Id.* at *3. Although observing that case law on direct shipment laws is "sparse," in ruling on cross motions for summary judgment and for dismissal Judge Bernard A. Friedman was persuaded by *Bridenbaugh* and two district court cases relying on early Supreme Court decisions finding that the twenty-first amendment gave states plenary authority, indeed " 'virtually complete control,' " to deal with importation and distribution of intoxicating beverages within their borders.[25] *Id.* at *5–8, *citing House of York, Ltd. v. Ring*, 322 F.Supp. 530 (S.D.N.Y. 1970), *Bainbridge v. Bush*, 148 F.Supp.2d 1306, and *Bridenbaugh*, 227 F.3d 848. The Michigan district court concluded that the system was constitutional because "direct shipment laws are a permissible exercise of state power under § 2 of the 21st Amendment." *Id.* at *8. That amendment "authorizes states 'to control alcohol in ways it cannot control cheese.' " *Id.* at *9, *quoting Bridenbaugh*, 227 F.3d at 851. Unlike Judge Easterbrook, however, Judge Friedman recognized and applied the limitation on that power recognized by later Supreme Court cases, i.e., that the facially discriminatory state law must further "core" concerns of the twenty-first amendment. i.e., "the interest of promoting temperance, ensuring orderly market conditions, and raising revenue." *Id., citing North Dakota*, 495 U.S. at 432, 110 S.Ct. 1986. The Michigan judge concluded that Michigan's direct shipment law could not be labeled as "mere economic protectionism" because it was one provision of a comprehensive system that regulates the flow of all alcoholic beverages into and within the State of Michigan, which Michigan selected "to ensure the collection of taxes from out-of-state wine manufacturers and to reduce the risk of alcohol falling into the hands of minors," a proper exercise of its power under § 2 of the twenty-first amendment. *Id.* at *10.

While both *Bainbridge* and *Heald* rely heavily on *North Dakota*, 495 U.S. 423, 110 S.Ct. 1986, 109 L.Ed.2d 420, in holding that the statutes-at-issue are constitutional, this Court is skeptical about whether that Supreme Court decision inevitably

---

**25.** In particular the Michigan court relied on *North Dakota v. United States*, 495 U.S. 423, 431, 110 S.Ct. 1986, 109 L.Ed.2d 420 (1990)(upholding the three-tier distribution system and concluding that "within the area of its jurisdiction, the State has virtually complete control' over the importation and sale of liquor and the structure of the liquor distribution system"), *citing California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 110, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980). *Heald*, sl. op. at *9.

controls the direct importation ban at issue here. This Court observes that *North Dakota* was a plurality opinion that is distinguishable on the facts and the law. In particular, in that suit the government challenged under the supremacy clause, not the commerce clause, North Dakota's regulations imposing labeling and reporting requirements on out-of-state suppliers of liquor that went to federal military bases, over which the government and North Dakota shared concurrent jurisdiction. Department of Defense regulations required that alcoholic beverages be obtained from the most competitive source. The plurality held that North Dakota's liquor control laws did not violate the doctrine of intergovernmental immunity and that the federal regulations requiring the government to purchase alcoholic beverages from the most competitive source did not preempt the state laws imposing reporting and labeling requirements, the focal issues before it. In the process, the plurality found that North Dakota had the "power to control shipments of liquor during their passage through [its] territory and to take appropriate steps to prevent the unlawful diversion of liquor into their regulated intrastate market..." 495 U.S. at 431, 110 S.Ct. 1986. It further concluded that the state's regulations "fell within the core of the State's power under the Twenty-first Amendment" and its comprehensive system for the distribution of liquor legitimately promoted temperance, orderly market conditions, and the raising of revenue. *Id.* at 432, 110 S.Ct. 1986. Thus the case is not directly on point and did not address discriminatory application of the regulations under the dormant commerce clause, no less a discriminatory treatment of out-of-state versus in-state beverages by North Dakota.

Located toward the opposite end of the spectrum of twenty-first-amendment interpretation, with a broader and more flexible reading of the text of § 2 and its relationship to the dormant commerce clause, two other federal district courts have examined state laws relating to direct importation of wine and determined that the statutes were unconstitutionally discriminatory against out-of-state wine manufacturers and that their favoritism toward the local liquor industry was not saved by the twenty-first amendment. *Beskind v. Easley,* 197 F.Supp.2d 464 (W.D.N.C.2002); *Bolick v. Roberts,* 199 F.Supp.2d 397 (E.D.Va. 2002).

In *Beskind,* the plaintiffs were comprised of (1) six North Carolina oeniphiles seeking to invalidate a North Carolina ban on the purchase, without a permit from the North Carolina Alcoholic Beverage Control Commission,[26] of wine directly from out-of-state manufacturers, (2) a small California winery that had received wine requests from North Carolina consumers, and (3) a Michigan resident who wanted to send gifts of wine to his parents living in North Carolina. 197 F.Supp.2d at 466. The regulation of the sale and distribution of alcoholic beverages in North Carolina, similar to that in Texas, Indiana, Michigan, and Florida, is through a three-tier system. North Carolina requires an out-of-state manufacturer to obtain a permit from North Carolina Alcoholic Beverage Control Commission in order to sell wines to an in-state, licensed wholesaler.[27] *Id.* As

**26.** N.C. Gen.Stat. § 18B–109(a)("No person shall have any alcoholic beverage mailed or shipped to him from outside of this State unless he has the appropriate ABC permit.")

**27.** Under N.C. Gen.Stat. § 18B–102, it is illegal to "manufacture, sell, transport, import, deliver, furnish, purchase, consume or possess any alcoholic beverages except as authorized by the ABC law." Violation of this section is a misdemeanor. N.C. Gen.Stat. § 18B–102(b). N.C. Gen.Stat. § 18B–102.1 provides, "It is unlawful for any person who is an out-of-state retail or wholesale dealer in the business of selling alcoholic beverages to

currently in Texas, most alcohol sold in North Carolina passes through the three-tier system, with a significant exception: local wineries and retailers may ship directly to North Carolina purchasers. *Id.* at 467 ("Thus, in-state wineries can bypass the middle tier (wholesalers) and bottom tier (retailers) and sell wine only through the three-tier system, for 'an out-of-state wine retailer cannot obtain a permit to ship directly to a North Carolina resident.' "), *citing* N.C. Gen.Stat. §§ 18B–1001(4) and –1001. Thus the statutes challenged by the plaintiffs, prohibiting direct shipments by out-of-state wine sellers, apply only to interstate commerce, but not to intrastate. *Id.* at 467.

The plaintiffs in *Beskind* argued that North Carolina facially discriminated against interstate commerce, impermissibly regulating out-of-state transactions for economic protectionism of its in-state wine industry, while the defendants (various state officials) contended that the ABC laws established a scheme of "evenhanded regulation that indirectly affects interstate commerce." *Id.* at 469. In a perceptive opinion, Chief Judge Mullen concluded that plaintiffs were not challenging the three-tier system, but rather North Carolina's failure to apply that system uniformly and even-handedly to in-state and out-of-state wineries; in other words, they questioned not the system as a whole and North Carolina's right to establish one, but

rather the exception giving preferential treatment to local wineries.[28] He applied the balancing test developed by the Supreme Court in cases including *Brown–Forman* and *Bacchus Imports* and strictly scrutinized the purpose and effect not only of North Carolina's three-tier system, but more particularly of the exemption giving preferential treatment to in-state wineries. He noted that "clearly the legitimacy of the ABC system generally is not the same as this matter's core issue of the Constitutionality of a disparity inherent in applying an otherwise legitimate system fully to out-of-state interests, but only mostly to in-state interests. Concerns about quality control and safety, tax collection and administration justify North Carolina's need for the ABC system generally, but not the specific exception's constitutionality." *Id.* at 470.

Chief Judge Mullen, concluding that "the North Carolina ABC laws present a relatively cut and dry example of *direct* discrimination against interstate commerce," in a "statutory scheme that is unequivocally *not* 'evenhanded,' " held that the statute discriminated in violation of the commerce clause and should be invalidated. *Id.* at 471. Relying on *TFWS, Inc. v. Schaefer*, 242 F.3d 198 (4th Cir.2001), Judge Mullen applied a balancing test and identified the "correct inquiry" as " 'whether the interests implicated by a

---

ship or cause to be shipped any alcoholic beverages directly to any North Carolina resident who does not hold a valid wholesaler's permit under Article 11 of this Chapter." The violation of § 18B.102.1 is a felony. N.C. Gen.Stat. 18B–102.1(e). N.C. Gen.Stat. 18B–1114, applicable specifically to out-of-state-wine vendors, provides that "the holder of a nonresident wine vendor permit may sell, deliver, and ship unfortified and fortified wine in this State only to wholesalers, importers, and bottlers, licensed under this Chapter." *See generally Beskind,* 197 F.Supp.2d at 466–67.

**28.** Defendant in the instant case tries to make the same argument that Plaintiffs are challenging Texas' entire three-tier regulatory system by attacking the ban on direct importation of out-of-state wines by Texas residents. Judge Friedman took this view in *Heald* in finding that Michigan's direct shipping ban was but "one provision of a comprehensive system that regulates the flow of all alcoholic beverages into and within the State of Michigan." Sl. Op. at 10.

state regulation are so closely related to the powers preserved by the Twenty-first Amendment that the regulation may prevail, notwithstanding that its requirements directly conflict with express federal policies.' ... These interests preserved by the Twenty-first Amendment do not encompass 'unsubstantiated state concerns'; North Carolina must demonstrate that its regulatory policies directly serve interests it proffers under the Twenty-first Amendment. [citations omitted]" *Id* at 472. Emphasizing that the State failed to present any reason for applying its ABC laws unevenly in its exception for local wineries, he concluded that the only explanation was "protection of local economic interests, which the Commerce Clause will not tolerate." *Id.* at 472–74. Furthermore he distinguished the facts before him from those in *Bridenbaugh,* 227 F.3d 848, where the Indiana statute applied equally to liquor originating within and without Indiana, and therefore did not favor in-state liquor manufacturers. *Id.* at 474–75. Granting the plaintiffs' motion for summary judgment, Chief Judge Mullen concluded that the challenged statutes violated the commerce clause. As a remedy, because "[i]t is the task of the North Carolina legislature and not this Court, to design a non-discriminatory regulatory structure for the sale of alcoholic beverages in the state," the court enjoined the defendants from enforcing the statutes. *Id.* at 475–76.

In the other recent case dealing with a state ban on direct marketing and shipment of liquor from out-of state producers,[29] *Bolick v. Roberts,* 199 F.Supp.2d 397 (E.D.Va.2002)(adopting and modifying in part the report and recommendation of Magistrate Judge Dohnal which are included at 417–52), Judge Richard L. Williams held that provisions of the Alcoholic Beverage Control Act establishing Virginia's three-tier regulatory scheme facially placed differing and impermissible, economically discriminatory burdens on in-state and out-of state liquor producers, in permitting Virginia producers to ship directly to in-state consumers, while barring out-of-state producers from obtaining off-premises licenses or shipping directly,[30] and was not the only means by which the state could inspect, monitor and regulate intoxicating beverages (i.e., legitimate state interests).

Judge Williams agreed with Magistrate Judge Dohnal's thorough and detailed findings and recommendation that *Bridenbaugh* was inapplicable, since Judge Easterbrook maintained that there was no "functional discrimination" because "*every* drop of liquor" passed through Indiana's three-tier system, while the Virginia statutes allow in-state producers and off-premises licensees to ship directly to in-state consumers without requiring that they pass through its three-tier regulatory system while prohibiting out-of-state producers from doing the same. 199 F.Supp.2d at 408, 410–11, 429–30. Judge Williams and the Magistrate Judge also viewed *Bridenbaugh* as incorrectly decided because it did not apply established dormant commerce clause analysis and strict scrutiny and ignored the interstate commerce issues raised by the facts of the case. *Id,* at 408, 429–34, *citing inter alia Midcal,* 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233; *Bacchus Imports,* 468 U.S. 263, 104 S.Ct.

---

**29.** Originally the suit dealt only with wine, but was expanded to cover shipment and distribution of all alcoholic beverages to avoid piecemeal litigation. 199 F.Supp.2d at 418.

**30.** The specific statutes challenged by the plaintiffs were the following sections in the Virginia Code Annotated (West): 4.1–103. subd. 1; 4.1–119, subd. A; 4.1–207, subds. 2, 4, 5; 4.1–208, subds. 3, 6, 7, 8; 4.1–209, subd. A, pars. 2, 5; 4.1–302; 4.1–303, and 4.1–310, subds. B, C.

3049, 82 L.Ed.2d 200. They further concluded that Judge Easterbrook's analysis of the history and text of § 2 was very narrow and disregarded the evolution of case law consistent with that text and history in the twentieth century. *Id.* at 430, 433.

The two also concurred that the holding in *Kronheim,* 91 F.3d 193, that the mixture of tainted and legitimate motives was sufficient to save a facially discriminatory warehousing requirement of the regulatory system in the District of Columbia, was not binding on them and was contrary to the Fourth Circuit's rule in *TFWS,* 242 F.3d at 212, that a discriminatory regulation that does not directly serve the legitimate core interests asserted by the state is unconstitutional and should be invalidated. Moreover, they criticized the D.C. Circuit for failing to analyze adequately whether the state's concerns could have been achieved by alternative, nondiscriminatory means. *Id.,* 199 F.Supp.2d at 437.

As for the remedy for the statutes determined to be unconstitutional, the district court disagreed with the Magistrate Judge's conclusion that the offending provisions that favored in-state wine and beer producers were severable from the rest of the Alcoholic Beverage Control Act. Instead, guided by the Virginia Supreme Court's opinion in *Heublein, Inc. v. Dept. of Alcoholic Beverage Control,* 237 Va. 192, 376 S.E.2d 77 (1989), the district court concluded that the main statute was "defective because of underinclusion" and that the better option under federal remedial law was to extend a benefit rather than nullify it. Therefore the court declared that all the statutes challenged by the plaintiffs effecting the ban against direct shipment of wine and beer from out-of-state were unconstitutional and enjoined

their enforcement. 199 F.Supp.2d at 416, *citing Welsh v. United States,* 398 U.S. 333, 361, 90 S.Ct. 1792, 26 L.Ed.2d 308 (1970)(Harlan J., concurring)(court may "either declare [the statute] a nullity and order that its benefits not extend to the class that the legislature intended to benefit, or it may extend the coverage of the statute to include those who are aggrieved by the exclusion"); *California Fed. Sav. & Loan Ass'n v. Guerra,* 479 U.S. 272, 291–92, 107 S.Ct. 683, 93 L.Ed.2d 613 (1987)(courts should generally apply a presumption of extension of benefits rather than nullification); *Nguyen v. I.N.S.,* 533 U.S. 53, 95–96, 121 S.Ct. 2053, 150 L.Ed.2d 115 (2001)(Scalia, J., with Thomas, J., concurring)("[I]n the absence of legislative direction *not* to sever [an] infirm provision, 'extension rather than nullification' of a benefit is more faithful to the legislative design"); *Environmental Tech. Council v. Sierra Club,* 98 F.3d 774 (4th Cir.1996)(striking down caps on out-of-state hazardous waste rather than applying them to in-state waste).

In the only recent case decided by the Fifth Circuit Court of Appeals dealing with the relationship of § 2 and the dormant commerce clause, *Cooper v. McBeath,* 11 F.3d 547 (5th Cir.), *cert. denied,* 512 U.S. 1205, 114 S.Ct. 2675, 129 L.Ed.2d 810 (1994), the appellate court struck down Texas' three-year durational residency and citizenship requirements in the Texas Alcoholic Beverage Code for obtaining a liquor permit from the TABC because these restrictions constituted economic protectionism of in-state economic interests at the expense of out-of-state competitors, in violation of the dormant commerce clause. In doing so, writing for herself and Judge Reynaldo G. Garza,[31] Judge Edith Jones

---

**31.** The third member of the panel, Judge Williams, passed away before the decision was rendered.

applied the "two-tier approach" of United States Supreme Court: (1) "statutes that directly discriminate against interstate commerce, or whose effects favor in-state economic interests at the expense of out-of-staters," should be invalidated "unless the discrimination is demonstrably justified by a valid factor unrelated to economic protectionism"; or (2) "[w]hen ... a statute regulates in an evenhanded manner and had only direct effects on interstate commerce, we assess 'whether the State's interest is legitimate and whether the burden on interstate commerce clearly exceeds local benefits.'" *Id.* at 553 (citations omitted). Judge Jones noted, "While no clear rule exists to tell us when to apply the stricter rule of invalidity, ... a finding of economic protectionism can be based solely upon a statute's discriminatory effect." *Id.* She further concluded that while protectionism may not be evident in the legislature's intent, if it is evident in the statute or regulations's effect, the favoritism for in-state interests "cannot be ignored as incidental." *Id.* Furthermore, even if overtly discriminatory, a statute can survive a commerce clause challenge if the State can proffer " 'a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives,'" subject to "the strictest scrutiny." *Id.* (citations omitted).

Moreover, the Fifth Circuit found that Texas' boilerplate explanation that its alcohol distribution system established under its police power was designed "to protect the health, safety, welfare, morals and temperance of its citizens" was insufficient to justify its "particular restrictions on out-of-state ownership of various liquor licenses." *Id* at 554. The State had also claimed that its permit approval process was "based on an intensely local screening of each applicant's reputation in the community plus a complete, thorough business and financial investigation performed by TABC" and that the TABC's "ability to investigate an out-of-state applicant's reputation and qualification is severely limited." The appellate court responded, "[H]owever legitimate may be the State's ultimate goals, it cannot pursue them via the illegitimate means of a flat proscription of non-Texans." *Id.* It also found "no shortage of less burdensome, yet suitable options" for investigations of and demands for information from applicants by "computer networks, fax machines, and other technological marvels," instead of burdening applicants with required residency in Texas. *Id.*

Furthermore, citing and quoting passages discussed earlier in this memorandum from *Hostetter,* 377 U.S. 324, 84 S.Ct. 1293, 12 L.Ed.2d 350, and *Bacchus Imports,* 468 U.S. 263, 104 S.Ct. 3049, 82 L.Ed.2d 200, Judge Jones reaffirmed, "The assertion that § 2 of the Twenty-first Amendment trumps the rigors of the Commerce Clause cannot stand ..." and proclaimed that the state's unique power to structure its liquor distribution system "must co-exist with Congress' power to regulate commerce." *Id.* at 555. Judge Jones reiterated the words of the Supreme Court in *Bacchus Imports:* "[T]he central purpose of the Amendment was not to empower States to favor local liquor industries by erecting barriers to competition" and that "laws that constitute mere economic protectionism are ... not entitled to the same deference." *Id., quoting Bacchus Imports,* 468 U.S. at 276, 104 S.Ct. 3049. Concluding that the residency restrictions constituted a "statutory barrier Texas has erected against non-residents who wish to obtain mixed beverage permits [that] results in shielding the State's operators from the rigors of outside competition," Judge Jones found that "the state's interest in facilitating background checks of permit applicants by discriminating against nonresidents is not within the

'core concerns' of the Twenty-first Amendment." *Id.*

Like the district court in *Bolick,* this Court views itself as bound by the appellate court in its own Circuit and by United States Supreme Court case law as it has developed through the last century. Nevertheless this Court is aware of recent decisions strengthening states' rights at the expense of federal powers under the commerce clause, though not involving economic matters. *See e.g., Printz v. United States,* 521 U.S. 898, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997), and *United States v. Lopez,* 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995). More specifically this Court recognizes that in dissents to some of the key cases involving the relationship between the commerce clause and the twenty-first amendment, cited and relied upon by this Court, some of the current members of the high court have individually indicated that the focus of such analysis should not be legislative motivation, core purposes or legitimate goals, have suggested that the implied dormant commerce clause should not have the limiting power over the commerce of alcohol that the majority opinion of the Supreme Court has given it and that it does have in regulation of other interstate goods, and have broadly defined the power given to the states under the twenty-first amendment to regulate importation and sale of out-of-state liquor in a manner similar to the position of Judge Easterbrook.[32] Nevertheless, this Court is bound by the opinions of the existing law, i.e., the majority opinions, and, under the doctrine of *stare decisis,* so is the current Supreme Court. Furthermore, this Court must follow the rulings of the Fifth Circuit.

■ This Court concludes that Texas' ban on direct importation of wine violates the dormant commerce clause. In the context of § 110.053 of the Texas Alcoholic Beverage Code, § 107.07(f) on its face is unconstitutionally and economically discriminatory against out-of-state wine producers, imposing differing burdens on in– and out-of-state producers so as to favor in-state wineries, as expressly reflected in the Texas Marketing Act. Because out-of-

---

**32.** *See e.g., Bacchus Imports,* 468 U.S. at 286–87, 104 S.Ct. 3049 (Stevens, J. dissenting)(calling the majority's statement that " 'state laws that constitute mere economic protectionism are not entitled to the same deference as laws enacted to combat the perceived evils of an unrestricted traffic in liquor' " "a totally novel approach to the Twenty-first Amendment. The question is not one of 'deference,' nor one of 'central purpose'; the question is whether the provision in this case is an exercise of a power expressly conferred upon the States by the Constitution. It plainly is."); *Id.* at 279 n. 5, 104 S.Ct. 3049 (Stevens, J., dissenting, joined by J. Rehnquist and J. O'Connor)("Given the dual character of the [Commerce] Clause, it is not at all incongruous to assume that the power delegated to Congress by the Commerce Clause is unimpaired while holding the inherent limitation imposed by the Commerce Clause on the States is removed with respect to intoxicating liquors by the Twenty-first Amendment."); *324 Liquor Corp. v. Duffy,* 479 U.S. 335, 359– 60, 107 S.Ct. 720, 93 L.Ed.2d 667 (1987)(O'Connor, J. dissenting)("The proper inquiry ... is not whether the State of New York chose wisely in enacting a retail price maintenance law, nor whether the State of New York's motivation in doing so was linked to a 'central [purpose]' of the Twenty-first Amendment. The sole 'question is whether the provision is an exercise of a power expressly conferred upon the States by the Constitution.' " (*quoting* J. Stevens in *Bacchus Imports*)); *Healy v. Beer Inst.,* 491 U.S. 324, 349, 109 S.Ct. 2491, 105 L.Ed.2d 275 (1989)(Rehnquist, C.J., dissenting)("The Court in the present cases barely pays lipservice to the additional authority of the States to regulate commerce and alcoholic beverages granted by the Twenty-first Amendment. Neglecting to consider that increased authority is especially disturbing here where the perceived proscriptive force of the Commerce Clause does not flow from an affirmative legislative decision and so is at its nadir.").

state producers must go through Texas-licensed wholesalers and retailers to sell wine in Texas, they suffer higher costs which translate into higher prices, which in turn affect their ability to compete with local Texas wineries. Indeed, given the small number of Texas wholesalers and the burgeoning number of wineries, the requirement that they go through Texas wholesalers essentially may lock most of them out of any access to Texas markets, even if they are willing to take on the additional costs. Such discrimination is especially felt by small, family-run wineries with limited production, like Wiederkehr Wine Cellars. Plaintiffs are deprived an opportunity to enjoy wines of out-of-state small vintners despite the increased ease of access to Texas wines provided under the Marketing Act.

Moreover, unlike the situation in Indiana, Michigan, and Florida, this Court cannot ignore the fact that Texas now ranks fifth among the states in wine production.[33] The Marketing Act, which promotes access to Texas wines for Texas residents, explicitly reflects a protective concern for the burgeoning wine industry in Texas and the legislature's hopes that vintners in Texas will soon be able to compete with established wine growers in California, New York, Washington, Oregon and Europe.

This Court accordingly follows the Supreme Court precedent of the past thirty-five years, the Fifth Circuit's approach to the tensions between § 2 and the twenty-first amendment in *McBeath,* and the district court opinions in *Bolick* and *Beskind.* Defendants, while explaining that Texas' three-tiered system serves legitimate state interests within the core powers of the twenty-first amendment, such as temperance, revenue collection, and "orderly market conditions," fail to demonstrate how a statutory exception for local wineries from Texas' three-tier regulatory system allowing them to ship directly to Texas residents is justified by any of the traditional core concerns of the twenty-first amendment. Nor has the State shown that the core interests of taxation and orderly market conditions that justify its larger three-tier system could not be effected by alternative, nondiscriminatory options for these out-of-state wineries.

Accordingly, the Court hereby

ORDERS that Plaintiffs' supplemental motion for summary judgment is GRANTED and Defendant's cross motion is DENIED.

The Court hereby

DECLARES that Tex. Alco. Bev.Code § 107.07(f) is facially unconstitutional.

This Court further

■ DECLARES that §§ 6.01 (permitting *inter alia* importation of alcoholic beverages only if the person importing has first obtained a license or permit); § 11.01 (outlawing the importation of liquor, in-

---

**33.** *See, e.g.,* Michael A. Lindenberger, *The Sweet Smell of Growth: State's Winemakers Say Legislative Compromise will Help Business,* Dallas Morning News, Apr. 22, 2001, available at 2001 WL 18816339. In this article Lindenberger reported, "A compromise reached this week in Austin has turned Texas winemakers *into* California dreamers." Noting that "only about 4 percent of Texas wine is sold outside of the state, and Texans themselves drink far more out-of-state wine than they do wine made here," Lindenberger quot- ed David Swinford, House Agriculture and Livestock Committee Chairman and one of the sponsors of the bill that gave birth to the Marketing Act, as saying, "My personal feeling is this: We have some wineries that compete nationally and internationally today.... But we also have a huge market in Texas, so we need to give our wineries a chance to grow and stabilize, and to get some substance, so that they can be ready when the walls come tumbling down."

cluding wine, without a permit); § 37.03 ("A nonresident seller's permit is required of any distillery, winery, importer, broker, or person who sells liquor to permittees authorized to import liquor into this state, regardless of whether the sale is consummated inside or outside the state."); § 107.05(a) ("No person may import liquor into the state and deliver it to a person not authorized to import it."); and § 107.07(a) are unconstitutional as applied, depriving Plaintiffs (as Texas residents over twenty-one years of age, not otherwise statutorily prohibited from possessing alcoholic beverages and living in "wet" areas) of their right to engage in interstate commerce by importing out-of-state wine for personal consumption without the threat of criminal punishment if they violate the statute.[34] Because legislating is not the proper role of the Court, in the final judgment it will enjoin the State of Texas from enforcing these statutes and defer to action by the legislature to repair the Alcoholic Beverage Code. Finally, the Court

ORDERS Plaintiffs' counsel to file within two weeks of receipt of this order a specific request and supporting affidavit with any necessary time records to recover reasonable and necessary fees for legal services in this litigation. Any objections shall be filed within ten days of service of that material on Defendant. The Court will then issue a final judgment.

---

**34.** As noted in the Court's previous memorandum and order, Alcoholic Beverage Code § 1.05 makes a violation of § 107.07 a Class C misdemeanor.